[Cite as *State v. Price*, 2023-Ohio-3790.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                    No. 111921

    v. :

DEANDRE PRICE, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 19, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-655277-C

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey S. Schnatter and Margaret Graham, Assistant Prosecuting Attorneys, *for appellee*.

Russell S. Bensing, *for appellant*.

LISA B. FORBES, J.:

{¶ 1} Deandre Price ("Price") appeals his convictions for aggravated murder, murder, and felonious assault, with all counts carrying firearm specifications. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I.    Facts and Procedural History

{¶ 2}    On the night of September 12, 2020, Malik Moore ("Moore") was shot nine times in Cleveland Heights and pronounced dead upon his arrival to the hospital.  Police responded to a call of shots fired and recovered 13 shell casings from the street and yards of two adjacent properties.  Several witnesses heard two rounds of gunshots, separated by a brief pause, and saw a dark-colored car with a distinctive taillight and a loud exhaust speed away from the scene.

{¶ 3}    On January 11, 2021, Price and codefendant Quincy Hubbard ("Hubbard") were indicted for aggravated murder, murder, and felonious assault.  Codefendant Tyrell Wilkins ("Wilkins") was indicted for tampering with evidence and obstructing justice.  Wilkins ultimately pled guilty to attempted tampering with evidence and was sentenced to community-control sanctions.

{¶ 4}    The case against Price and Hubbard proceeded to trial on May 24, 2022.  On June 3, 2022, a jury found Price guilty as charged in the indictment.  Hubbard was found guilty of felonious assault, acquitted of the remaining charges, and sentenced to 8 to 12 years in prison.  In August 2022, the court sentenced Price to life in prison with parole eligibility after serving 28 years.

{¶ 5}    Price now appeals, raising two assignments of error for our review.

> I.     The trial court erred in admitting testimony by a witness that the victim's blood was found in the Defendant's car, and to allow the witness to testify without stating that his conclusions were to a reasonable scientific certainty.

> II.    The Defendant's conviction was against the manifest weight of the evidence.

## II. Trial Testimony and Evidence

### A. Undisputed Facts — For Background and Context

{¶ 6} Much of the evidence presented through witness testimony in this case is undisputed and unchallenged on appeal. The following is a summation of this testimony to serve as context for Price's appeal. As stated, several witnesses consistently testified that they heard shots fired on the night of Moore's murder and saw a dark car with atypical taillights and a loud exhaust speed away from the scene. One witness testified that he saw a "figure move behind the car from the driver's side to the passenger's side." Witnesses also testified that Price, Hubbard, and Moore had a history of disagreements dating back to 2014.

{¶ 7} Video-surveillance footage from several security cameras in the area led police to a Dodge Charger registered to Price (the "Charger"). Price was seen in the video footage entering and exiting local establishments at the same time as Moore. This took place approximately 6 minutes to 30 minutes before Moore was murdered. Cell-phone data introduced into evidence showed that Price, Hubbard, and Jerry Howard ("Howard") communicated several times on the night in question around the time Moore was killed. Additionally, some of the communications between Price and Hubbard on that night had been deleted prior to the authorities taking possession of Price's phone.

{¶ 8} Forensic evidence showed that all 13 shell casings recovered from the scene of Moore's murder, along with seven bullets that were recovered during Moore's autopsy, "were fired from the same unknown Glock 9 millimeter caliber

pistol." Evidence was presented that Price purchased a Glock firearm, along with a flashlight attachment and ammunition, less than three months prior to Moore's murder. Forensic evidence further showed that Moore's DNA was found on the driver-side and front-passenger side floor mats of the Charger.

**B. Jerry Howard's Testimony**

{¶ 9} Howard testified that he is currently incarcerated on federal gun charges. In September 2020, which was when Moore was killed, Howard was living with Wilkins and Price. Howard has known Wilkins, Price, and Hubbard for "13 years, since middle school." Howard testified that he did not know Moore.

{¶ 10} According to Howard, he received multiple calls from Price "around like 9:30, 9:45" on the night of September 12, 2020, while Price was waiting in the Charger for Hubbard to come out of Hubbard's house. At the time, Howard was at his ex-girlfriend's house. Approximately 20 minutes later, Howard received another call from Price and Price told him to "get to the house." Howard testified that Price was "in distress, like something * * * was going on, like he was in a rush. Like come on, emergency." Howard left his ex-girlfriend's house and started driving toward his, Price, and Wilkin's house. On his way, Howard checked his security camera and saw Price, who was driving his Charger, pull into the driveway. Hubbard was sitting in the front-passenger seat. Price and Hubbard got out of the car and ran into the house. When Howard arrived at the house, Price, Hubbard, and Wilkins were already there. Price told Howard the following "story" of what occurred.

{¶ 11} Price saw Moore at a shop on Cedar and Lee Roads in Cleveland Heights. Price sat in the Charger and waited for Moore to exit the shop. Price called and picked up Hubbard "so that they could get" Moore. Hubbard drove the Charger, and they "met" Moore while Moore was walking home.

> And as soon as they caught [Moore] [Price] jumped out the car. And when he jumped out the car, he upped the gun with the flashlight to blind [Moore]. * * * It was really no talking after that. [Price] pulled the trigger and shot him as many times — It was rapid fire. * * * He said that he emptied the clip, but he didn't say how many times he hit him.

Howard testified that he had seen this particular gun of Price's before. It was new, and it was a "Glock 17 * * * Gen 5."

{¶ 12} Price told Howard that Moore died "[b]ecause of how many times he shot him." Howard saw blood on Price's pant leg and shoes. "[Price] said that after he shot [Moore], he ain't know if [Moore] was dead or not, so to make sure that he was dead he kicked him in the head." Price and Hubbard then left in the Charger. At first, Hubbard was driving, but after seeing what Price did to Moore, Hubbard "couldn't really move. He said he was in shock, like he was * * * he couldn't really drive." Price told Hubbard to "get out the driver's seat and let me drive. So they switched seats before they got to my house." According to Howard, Hubbard said that he watched Price kill Moore and "couldn't really stomach it." Hubbard "was confirming everything that [Price] said." Price still had the Glock with him at the house, and he gave it to Wilkins and told Wilkins to "get rid of it."

{¶ 13} Howard explained that he got a "sentence reduction" for accepting responsibility for the federal gun charges and giving "substantial assistance and cooperat[ing with] an investigation conducted by Cleveland Heights" into Moore's murder. However, according to Howard, he was told about the federal sentence reduction approximately three months after he agreed to cooperate in Moore's murder investigation. "Basically in that situation was, they were trying to figure out what was going on and what the involvement was. And I cleared my name in the whole situation to let them know what was going on. And once * * * they did that, I want to say three months after they knew that I was telling the truth, they came and told me, like, okay, we're going to go ahead and drop this down for you." Howard testified that his federal sentencing range went from "41 to 51 months" to a "31 to 37-month sentence."

{¶ 14} On cross-examination, Howard testified that when he spoke with the police in September 2020, he told them that he "knew nothing about any homicides." Howard admitted that this was not true and testified that his "reason for doing that" was because he "had no attorney with [him] at the time. * * * [E]verybody knows you don't speak to the police without an attorney." It was not until December 11, 2020, that Howard agreed to cooperate with the government regarding Moore's murder. Additionally, it was not until March 2021 that Howard entered into a plea agreement in his federal gun case. According to Howard, the government did not "make any promises" to him in exchange for his cooperation. Asked if he decided "out of the goodness of your heart, to tell the police the truth,"

Howard responded as follows: "Absolutely. I'm clearing my name. I'm going to clear my name. I had absolutely nothing to do with that."

### C. Curtiss Jones's Testimony

{¶ 15} Curtiss Jones ("Jones") testified that he is "the supervisor of the trace evidence unit at the Cuyahoga County Medical Examiner's Office." Jones testified as follows regarding issues pertinent to Price's appeal.

{¶ 16} The Cleveland Heights Police Department submitted two floor mats for trace-evidence testing. First was the driver-side floor mat from the Charger. Jones testified that there was no "visible staining" on this floor mat. "[R]andom testing across the surface of the floor mat" revealed "a location where there was some positive presumptive test for blood." Jones further testified that a "[s]econd presumptive test" also showed a "reaction" for blood. A "sample was collected from within that circle and transferred to the DNA unit."

{¶ 17} The second item tested was the front passenger-side floor mat from the Charger. There was no visible staining, but "random chemical testing of the surface * * * showed one portion of the surface had positive reaction, presumptively for blood." A second presumptive test was "performed on the entire surface, of which in that same area there was positive reaction." A "sample was collected and transferred to the DNA unit."

{¶ 18} Jones testified that no "confirmation" testing was done on the floor mats after the "presumptive testing for blood." Jones further explained why:

> Typically in samples that aren't visible — so these are samples that had
> tested presumptive positive through randomized testing or through an

overall spray or they're latent, we can't see them, we kind of have to make a decision about what's best for the sample in terms of — you don't know how much is there anyway. So what we typically like to do is once we have that presumptive positive, we'll just submit those to the DNA unit in hopes that they can take whatever amount of sample they need, and keeping in mind that they have to retain some for future testing if necessary, in a hope that they can take that sample and get a DNA profile from that.

{¶ 19} Jones further testified that, had he conducted more testing,

the result that we could get would be a forensic confirmation for human blood. It wouldn't tell us that it's absolutely human blood as opposed to any other material in the world. So the trace evidence unit's thought is that it's best to let DNA get a shot at it in [an] attempt to get a DNA profile and not consume the sample they may need if they don't get a profile, so that's typically where we just do presumptive and send to them.

{¶ 20} Jones ended his direct-examination testimony by agreeing that his "conclusions and results" are "to a reasonable degree of forensic science certainty."

**D. Carey Boucher's Testimony**

{¶ 21} Carey Boucher ("Boucher") testified that she is a forensic scientist in the DNA unit of the Cuyahoga County Regional Forensic Science Laboratory in the Cuyahoga County Medical Examiner's Office. Boucher tested two items that "were transferred from the trace evidence department to the DNA department" and are pertinent to Price's appeal. First, she tested "[s]wabs of staining from driver side floor mat" of the Charger. Second, she tested "[s]wabs of staining from passenger side floor mat" of the Charger. Boucher also obtained DNA standards for Moore, Price, Hubbard, and Wilkins.

{¶ 22} Boucher testified as follows regarding the swab from driver-side floor mat: "A likelihood ratio was calculated assuming [this] item * * * contained DNA

from three unknown contributors, [and] a match was identified between [this] item and * * * Moore." Boucher also testified that "a match was identified between [the driver side floor mat swab] and * * * Price." Furthermore, "[n]o statistical support for a match was identified between" this floor mat swab and Hubbard or Wilkins.

{¶ 23} Boucher testified as follows regarding the front passenger-side floor-mat swab: "A likelihood ration was calculated assuming [this] item * * * contained DNA from four unknown contributors. A match was identified between [this] item and * * * Moore." Boucher further testified that "due to insufficient genetic information, match support for * * * Price to [the front passenger-side floor-mat swab] is inconclusive, and no statistical support for a match was identified between [this] item * * * and * * * Hubbard * * * or * * * Wilkins."

{¶ 24} After establishing that Moore's DNA was found on the floor mats of the Charger, Boucher was next asked about "how DNA can end up on the pieces of evidence you test." Boucher explained as follows: "So essentially our whole field is based on the concept of transfer, that every time you come into contact with a person, place, thing, you have the opportunity to leave something of yourself behind." "Primary transfer" occurs when a person touches something. According to Boucher, "You're directly depositing your DNA on it." "Secondary transfer" occurs when a person touches something that a second person has previously touched and then deposits that second person's DNA onto another surface. According to Boucher, "[I]f I went to touch something * * * I could possibly deposit [another person's] DNA on the next surface that I touched. * * * [The other person]

didn't directly touch that thing, whatever that second thing I touched is, but perhaps some of her DNA was left there by me touching it."  Boucher testified that "it's possible that you didn't actually come into contact with a surface, but your DNA might be found on it."

{¶ 25} Boucher next explained the difference between "touch DNA" and "bodily fluid DNA."  Touch DNA most often involves skin cells, while bodily fluid DNA involves substances such as blood or saliva.  Boucher further testified as follows: "So a bodily fluid is going to be more stable and more hardy [sic].  Skin cells are more susceptible to * * * elements.  They can be more easily transferred or removed potentially by handling.  So in general, touch DNA is less stable, shall we say, than body fluids."

{¶ 26} Boucher further explain that, in addition to touch DNA being transferrable, bodily fluid DNA can be transferred to an object.  "Possibly, if it — yes, remains on the surface it was transferred to, to be then transferred to the next surface."  According to Boucher, she is able to conclude that a person's DNA was found on a floor mat, but she is not "able to say that person was inside that vehicle."

{¶ 27} The prosecutor next asked Boucher the following hypothetical question: "If — let's speak about blood in particular.  If somebody has either blood on their shoes or pants or on their person after they even exited that vehicle, would that make it more likely that they would have deposited it if that surface came in contact within that vehicle?"  Boucher responded with the following answer: "So if someone had blood or a bodily fluid on their clothing, got into a car, left it into the

car, and then got out of the car, they would leave it behind." Boucher further testified that

> it would be easier to leave biological materials such as blood behind if the surface is wet. That would be an easy transfer. If it's dry, that's possible too. It would be more crumbly in nature than just the direct easy transfer of a wet stain. But, so if you transferred blood, however mode that may be, then you would — you may still have some on your clothing to then leave the vehicle or leave whatever object you were in contact with.

> {¶ 28} The prosecutor next asked Boucher another hypothetical question:

> Q: If a person were to come in contact with * * * Moore's blood outside of the vehicle with his foot by kicking him, * * * picking up some of his blood, and [this person] got into the passenger side of a vehicle, would that be a reasonable explanation for why * * * Moore's blood is found inside of * * * Price's vehicle on the floor mat in the passenger side?

> * * *

> A: Yes, that could be an explanation.

> Q: And if the individual who kicked * * * Moore were to switch and then begin driving the vehicle, would that be a reasonable explanation for why * * * Moore's blood is found both on the passenger side and the driver side?

> * * *

> A: Yes, that could be an explanation.

> * * *

> Q: The conclusions you found and you testified to, are they to a reasonable degree of medical certainty or scientific certainty?

> A: Yes. All of our conclusions in our reports are based on our standard operating procedures, yes.

> Q: And the answers to my hypotheticals I asked you, are they based on all of your training and experience and knowledge of DNA?

> A: Yes.

{¶ 29} On cross-examination, Price's defense counsel asked Boucher if she tested any of the evidence for blood. Boucher answered that she did presumptive testing for blood regarding the swabs taken from Moore's hands, but "[n]one of the other] evidence items that I did DNA testing on did I do any presumptive test for the presence of blood." Boucher testified that "whether it is saliva, whether or not it's skin cells or any other genetical material," she tests for DNA. "I can't tell you in a sample, in a mixture, what specifically the DNA is coming from * * *."

{¶ 30} Price's defense counsel also asked Boucher about numerous hypothetical scenarios concerning how a person's DNA might end up on an object that they did not touch. For example, defense counsel asked Boucher the following questions: "Now, when we talk about transfer DNA, there are a number of scenarios that can be painted — when I say painted, that could happen — that could cause the presence of DNA being found in an area in which evidence is collected?"; "And in a mixture itself, hypothetically a person whose standard is, quote, unknown, could deposit DNA of someone else in that mixture that could be identified; would that be fair?"; and "[T]heoretically an object, for instance, a shoe can — something from a shoe can be transferred to another object. That's possible?" In general, Boucher answered that all of these defense-posed hypotheticals were possible.

{¶ 31} On redirect examination, Boucher testified that, regarding the swabs taken from the Charger's floor mats, "there is support that whatever was swabbed, there was some blood there. There was support for that based on that presumptive test" administered by Jones in the trace evidence unit.

### III. Law and Analysis

#### A. Admission of Evidence

{¶ 32} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). A trial court abuses its discretion when its decision "'is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). The Ohio Supreme Court recently explained that an abuse of discretion "involves more than a difference in opinion * * *." *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, ¶ 24. That is, a trial court's judgment that is "profoundly and wholly violative of fact and reason" constitutes an abuse of discretion. *Id.*

{¶ 33} Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

### 1. The Victim's Blood and DNA Evidence

{¶ 34} In the first part of Price's first assignment of error, he argues that it was improper for the prosecutor to refer to the "stains" on the Charger's floor mats as "blood" during Boucher's testimony, because "there was no factual basis * * * that the DNA sample taken from the floor mats was blood." Price further argues that this testimony should not have been admitted at trial.

{¶ 35} Evid.R. 705 states in part that an "expert [witness] may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data." Evid.R. 703 states that the "facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing."

{¶ 36} To support his argument on appeal, Price cites to *Armbruster v. Hampton*, 9th Dist. Lorain No. 05CA008716, 2006-Ohio-4530. In *Armbruster*, our sister court found that the trial court acted within its discretion when it excluded "a mere conclusory opinion statement from [the expert witness's] report without any disclosure of the underlying facts or data." *Id.* at ¶ 73. The *Armbruster* Court concluded that the "appellant failed to comply with the mandates of Evid.R. 705 and lay a proper foundation for the admission of [the expert's] testimony." *Id.*

{¶ 37} Price also relies on this court's holding in *Werchola v. Premier Mfg. Corp.*, 8th Dist. Cuyahoga No. 37021, 1978 Ohio App. LEXIS 10244, 7 (Apr. 13, 1978), that expert testimony was inadmissible when "there [was] no testimony by which to support * * * a two-hour exposure by the claimant to noxious carbon

monoxide." The *Werchola* Court reasoned that "the hypothesis upon which an expert witness is asked to state an opinion must be based upon facts within the witness' own personal knowledge or upon facts established by the evidence." *Id.*

{¶ 38} *Armbruster* and *Werchola* involve situations where the proponent of expert evidence failed to lay a proper foundation. In other words, no foundational evidence was introduced at trial to support the particular opinion testimony of an expert witness. That is simply not the situation in the case at hand. Extensive foundational testimony was introduced at Price's trial regarding DNA evidence in general and Moore's DNA that was found on the Charger's floor mats.

{¶ 39} The record shows, and Price concedes on appeal, that Jones testified that two presumptive tests were positive for blood, but "no confirmatory test was done." Furthermore, Howard testified that he saw blood on Price's shoes and pants, and Price told Howard that he kicked Moore in the head after he shot Moore to make sure Moore was dead.

{¶ 40} Boucher testified that swabs taken from staining found on the driver-side and front-passenger side floor mats of the Charger contained evidence of Moore's DNA. The bulk of Boucher's testimony concerned DNA evidence, and it goes unchallenged that Boucher was qualified under Evid.R. 702 to testify as an expert witness in the area of DNA evidence. Boucher testified that regardless of the substance she tests, her testing concerns DNA, which can be extracted from the simple "touch" of a surface or from various bodily fluids.

**{¶ 41}** Furthermore, evidence presented at trial established a "presumption" that the swabs taken from the floor mats in the Charger contained blood. Boucher's testimony regarding the "blood" found on the floor mats was consistent with this presumption that the swab of the floor mat contained blood.

**{¶ 42}** Accordingly, we cannot say that the trial court abused its discretion in allowing questions that the prosecutor asked Boucher about the "blood" on the floor mats that contained Moore's DNA.

### 2. Expert Witnesses and Hypotheticals

**{¶ 43}** In the final part of Price's first assignment of error, he argues that Boucher's testimonial responses to the prosecutor's hypothetical questions were not "made to a reasonable scientific certainty."

**{¶ 44}** Evid.R. 702(C) states that expert-witness testimony must be "based on reliable scientific, technical, or other specialized information." *See also State v. Jackson,* 92 Ohio St.3d 436, 448, 751 N.E.2d 946 (2001) ("An expert opinion is competent if it is held to a reasonable degree of scientific or medical certainty."); *State v. Samuels*, 8th Dist. Cuyahoga Nos. 81333 and 81334, 2003-Ohio-2865, ¶ 24. Furthermore, Evid.R. 705 states in part that expert testimony "may be in response to a hypothetical question * * *."

**{¶ 45}** According to Boucher, the conclusions that she testified to were made to a reasonable degree of scientific certainty. This is proper under Evid.R. 702(C). The prosecutor additionally asked Boucher the following question: "And the answers to my hypotheticals I asked you, are they based on all of your training and

experience and knowledge of DNA?" Boucher answered, "Yes." The phrasing in this question is grounded in Evid.R. 702(B), which states that a "witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony * * *." Nothing in this colloquy leads us to conclude that Boucher's answers to the prosecutor's hypothetical questions were not based on her reasonable degree of scientific certainty. In other words, Evid.R. 702(B) and 702(C) are not mutually exclusive — as long as expert-witness testimony is based on reliable scientific information, it can also be based on specialized knowledge, skill, experience, training, or education.

{¶ 46} Upon review, we find that the court acted within its discretion regarding the admissibility of the prosecutor's hypotheticals and Boucher's answers. Accordingly, Price's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

### 1. Standard of Review

{¶ 47} In his second assignment of error, Price first argues that an "appellate court in a manifest weight review should not defer to the jury's findings of credibility." Specifically, Price argues that an "appellate court will never disagree with the fact-finder's resolution of the conflicting testimony if it invariably defers to the fact-finder's resolution of the conflicting testimony." The entirety of Price's argument that his conviction was against the manifest weight of the evidence follows:

> Price's conviction hinged almost entirely on the testimony of Jerry Howard. Howard had admittedly lied to the police when he was first

interviewed on September 20, 2020. He came forward only in the hopes of ameliorating the sentence in his Federal case. His testimony about the conversation with Price was not corroborated by Wilkins, who had the same motive to testify — mitigation of his sentence for tampering — as did Howard.

The police never located the gun that was supposedly used in the shooting, and frankly admitted that they could not discern a motive for Price's killing of Moore. In viewing the totality of the evidence, it manifestly did not support Price's conviction.

{¶ 48} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 49} The jury found Price guilty of the following offenses with firearm specifications. R.C. 2903.01(A), which governs aggravated murder, states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *"; R.C. 2903.02(B), which governs murder, states that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree * * *"; and

R.C. 2903.11(A)(1), which governs felonious assault, states that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." Price's felonious assault conviction is a second-degree felony.

### 2. Manifest Weight in the Case at Hand

{¶ 50} Upon review, we find that the following evidence presented at trial weighs in favor of Price's convictions. Video-surveillance footage put Price in the same area as Moore immediately prior to Moore's murder. Witness testimony established that Moore, Price, and Hubbard had a history of disagreements. Witness testimony also established that multiple shots were fired and a car matching the Charger's description sped away from the scene. Forensic evidence showed that Moore's DNA was found on the Charger's floor mats. Howard testified that Price admitted that he and Hubbard followed Moore when Moore was walking home. Howard further testified that Price admitted he shot Moore multiple times and kicked Moore to make sure he was dead. Howard saw blood on Price's pant legs and shoes. Howard also testified that Price told him he both drove the Charger and sat in the front-passenger seat of the Charger immediately after Price murdered Moore.

{¶ 51} Howard's detailed testimony is corroborated by the forensic and video evidence introduced at Price's trial. Price's argument that Howard's testimony was not corroborated by Wilkins's testimony is not well-taken because Wilkins did not testify at Price's trial. Price's argument that the police could "not discern a motive for Price's killing of Moore" is also not well-taken. First, "motive" is not an

element of aggravated murder, murder, or felonious assault. Second, testimony at trial established that Price, Moore, and Hubbard had a history of disagreements.

{¶ 52} It is true that, in September 2020, Howard told the police that he did not know anything about Moore's murder, and in December 2020, Howard told the police a detailed accounting of Moore's murder based on what Price told Howard immediately after the murder. It is also true that, in March 2021, Howard entered into a plea agreement in his federal case, in which he received a "substantial assistance reduction" of his sentence in exchange for his agreement to "cooperate fully * * * in any state or local authorities in investigations and prosecutions * * *."

{¶ 53} Additionally, it is true that the police did not locate the murder weapon in this case. However, evidence in the record established that, under Price's instructions, Wilkins got rid of the gun Price used to kill Moore.

{¶ 54} We cannot say that the evidence presented at Price's trial weighs heavily in favor of reversal. Rather, the overwhelming evidence supports Price's convictions. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Murder convictions can rest upon circumstantial evidence. * * * Indeed, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *State v. Richey*, 64 Ohio St.3d 353, 363, 595 N.E.2d 915 (1992). This is not the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. Accordingly, Price's second assignment of error is overruled.

{¶ 55} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY J. BOYLE, J., CONCUR