[Cite as *State v. Hester*, 2019-Ohio-5341.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108207 |
| v. | : | |
| LORENZO HESTER, JR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 26, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-626585-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Brad Meyer, Assistant Prosecuting
Attorney, *for appellee.*

Patrick S. Lavelle, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Lorenzo Hester, Jr. ("Lorenzo"), appeals his

convictions and claims the following two errors:

1. The jury determination in the lower court in regards to Counts 1, 2,
3, 4, and 6, and all gun specifications was against the manifest weight
of the evidence.

2. There was no sufficient evidence presented to the trier of fact in the lower court proceeding to convict appellant of Counts 1, 2, 3, 4, 6, or any gun specifications.

{¶ 2} We find that Lorenzo's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. We, therefore, affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Lorenzo was charged with four counts of felonious assault, one count of improperly handling firearms in a motor vehicle, and one count of discharging of a firearm on or near a prohibited premises. All counts included one- and three-year firearm specifications, and Counts 5 and 6, which alleged improper handling of firearms in a motor vehicle and discharging a firearm on or near a prohibited premises, included five-year drive-by shooting specifications. The state alleged that Lorenzo fired several gunshots at Jaleesa Allums ("Jaleesa") and her three children in an effort to collect a drug debt owed by Jaleesa's cousin, Clarence Cooper ("Clarence").

{¶ 4} Jaleesa testified at trial that an unidentified man known as "Birdman" claimed that Clarence purchased $400 worth of crack cocaine from him but never paid for it. (Tr. 595.) Janet Cooper ("Janet"), Clarence's aunt, testified that Clarence had recently been thrown out of a group home and had come to live with her shortly before Birdman came to her house to collect the drug debt. Clarence is on disability, and when he became a resident of Janet's home, Janet became the payee of his social security checks.

**{¶ 5}** On June 1, 2017, Birdman took Clarence to a bank on East 55th Street in Cleveland to cash one of his social security checks. (Tr. 745, 801.) The bank teller knew Janet and called her to let her know that someone was trying to cash a check payable to her. (Tr. 745.) Janet told the teller that "if they cash the check they're going to jail." (Tr. 745.) Birdman later came to Janet's house on Phillips Avenue in Cleveland near the intersection of Phillips Avenue and East 123rd Street, handed her the check, and asked her to pay Clarence's drug debt. (Tr. 747.) Janet told him "no," and he left. He subsequently returned to the house and again asked for the money. Janet told him to leave her property. He returned a few more times to demand the money and, later that evening, Lorenzo came to the house and threatened: "It's a shame * * * somebody is going to get killed over money being owed." (Tr. 799.)

**{¶ 6}** Janet called the police and reported the threat. Officers Benji Gonzalez and Orlando Rivera of the Cleveland Police Department responded to Janet's house. Officer Gonzalez testified that while they were talking in Janet's front yard, two men showed up at the corner of East 123rd Street and Phillips Avenue. Janet identified one of the men as Birdman, but did not know the identity of the second man, who was wearing a gray hoodie. (Tr. 869.) According to Officer Gonzalez, the unidentified man in the gray hoodie "extended his right arm out in front of him as if he had gun and pointed it toward us." (Tr. 869.) Janet and the officers took cover, Officer Rivera ordered the man to drop the gun, and the two men ran away. (Tr. 887.)

{¶ 7} The next day, June 2, 2017, Janet again called the police because Lorenzo and Birdman were back demanding the money. (Tr. 809-810.) Officer Gonzalez, who was still on duty from the night before, responded to the call. Janet reported to him that Birdman and Lorenzo had returned, but they were gone by the time Officer Gonzalez arrived. (Tr. 869-870.)

{¶ 8} On June 3, 2017, Janet, her son Brett Allums ("Brett"), and her tenant, Walter Lucky, decided to leave the house to avoid the danger posed by Lorenzo and Birdman. Janet was packing her things for an extended stay at her daughter Jaleesa's house. (Tr. 593, 601.) Jaleesa and her three children came to Janet's house to help her pack. Janet's sister, Jesse Cooper, and her adult children, Dashae Cooper ("Dashae") and Devin Cooper ("Devin"), were also present. Devin testified that when he arrived at Janet's house, shortly before dark, he heard people yelling threats from the convenience store at the corner of Phillips Avenue and East 123rd Street. Devin heard them say: "It's going to go down, it's almost time, going to light that bitch up, and things like that." (Tr. 587.) According to Jaleesa, Lorenzo and Birdman warned that "at midnight my mother and my brother [were] going to be dead." (Tr. 599.)

{¶ 9} Sometime around 11:00 p.m., Janet and her family were ready to leave the house, and Jaleesa and her three children were the first to go. Jaleesa pulled out of Janet's driveway, turned onto Ingomar Avenue, drove to Lakeview Road, and circled back to East 123rd Street to check on her family. (Tr. 604.) She stopped at a stop sign for three to four minutes and texted her mother, Janet, to find

out where she went, but received no response. (Tr. 605.) Meanwhile, a Burgundy KIA Sorento came down East 123rd Street and stopped a few feet from Jaleesa's car and blocked her lane of travel. (Tr. 606.) Jaleesa explained:

> It continued to back up. And then I moved around it and got to the corner and that's when I kind of, like, looked over because I heard gunshots too, and I kind of, like, — when I hit the corner, I saw him running and shooting.

(Tr. 608-609.) Jaleesa testified that Lorenzo ran after her car while shooting. (Tr. 666.) The KIA stopped briefly near Lorenzo before continuing to pursue her. (Tr. 667.) Jaleesa did not see whether Lorenzo got into the car, but additional gunshots were fired from the car as it followed her. (Tr. 667-668.)

{¶ 10} Dashae testified that Jaleesa called her during the chase. According to Dashae, Jaleesa was screaming "They're trying to kill me, they're shooting at my car." Dashae asked Jaleesa who was shooting, and Jaleesa replied: "Lorenzo." (Tr. 711.) Dashae testified that she could hear gunshots through the phone while Jaleesa was talking. Dashae told Jaleesa to drive to the McDonald's at the corner of East 105th Street and St. Clair Avenue because it had surveillance cameras and the parking lot was well-lit. (Tr. 713.) Jaleesa heeded her cousin's advice and made it safely to the McDonald's. The KIA did not follow her to the McDonald's.

{¶ 11} During the chase, Jaleesa also spoke briefly on the phone with Janet and Brett, who were together in Janet's car. Janet testified that she was the last to leave her house on the night of June 3, 2017. She did not hear any gunshots when she left the house, but she "heard the gunshots on the phone." (Tr. 826, 829.)

Jaleesa told Brett that she was on Ingomar Avenue. Janet drove to that location, but Jaleesa was gone by the time they got there. (Tr. 831.) However, Janet observed Lorenzo running across the street with a long-nose revolver. (Tr. 831, 839.) Janet slowed the car, and Brett started shooting at Lorenzo with Janet's semiautomatic handgun. (Tr. 841.) Janet then took the gun from Brett and fired shots at Lorenzo. (Tr. 842-843.)

{¶ 12} Lorenzo disappeared in a dark alley leading to Ingomar Avenue. Janet drove onto Ingomar looking for Lorenzo and fired two gunshots into the air to let Lorenzo know that she knew he shot at her daughter and grandchildren. (Tr. 845.) Thereafter, Janet and Brett received a call that the family was congregating at the McDonald's in East 105th Street and St. Clair Avenue. When they arrived at the McDonald's, Jaleesa and her six-, eight-, and nine-year-old children were crying. (Tr. 634, 849.)

{¶ 13} Officer Rivera and Sergeant Michael Schwebs spoke with the family at the McDonald's. Sergeant Schwebs testified that he met Dashae before reaching the McDonald's because she was driving "frantically," and he was going to pull her over but she saw him and flagged him down. She told him that someone was chasing and shooting at her cousin. Sergeant Schwebs followed Dashae to the McDonald's where he met Jaleesa, who was "frantic" and "short of breath." (Tr. 913.) Sergeant Schwebs testified that Jaleesa "definitely appeared to be scared" and her children were crying. (Tr. 913.) The statements of Jaleesa and other members of the family

were recorded on Officer Rivera's body camera, which was played for the jury. (Tr. 883-884.)

{¶ 14} Janet did not tell police that she and Brett fired shots at Lorenzo, in part, because Brett was under disability and was prohibited from possessing a firearm. Nevertheless, Jaleesa is heard in the video telling police that "a dude" was shooting at her. Later in the video she identifies "the dude" as Lorenzo. When asked if Jaleesa was sure it was Lorenzo who shot at her, Officer Rivera responded: "There was no doubt." (Tr. 908.) Dashae showed police a photograph she had taken of Lorenzo on Janet's tree lawn earlier that day, and Jaleesa identified the person depicted in the photograph as Lorenzo. (Tr. 621; state's exhibit No. 11.)

{¶ 15} The jury found Lorenzo guilty of four counts of felonious assault and the one- and three-year firearm specifications attendant to each of those counts. He was acquitted of the improper handling of a firearm charge alleged in Count 5, but found guilty of discharging a firearm at or near a prohibited premises as alleged in Count 6. He was also acquitted of the accompanying five-year "drive-by shooting" specification attendant to that count. The trial court sentenced Lorenzo to eight years on each of the felonious assault convictions plus three years on attendant firearm specifications for a total of 11 years on each count. The court also sentenced him to three years on his discharging a firearm on or near a prohibited premises conviction. The court ordered two of the 11-year prison terms on the felonious assault convictions to be served consecutively and the remaining sentences to be

served concurrently for an aggregate 22-year prison term. Lorenzo now appeals only his convictions.

## II. Law and Analysis

{¶ 16} In the first assignment of error, Lorenzo argues his convictions, including the gun specifications, are against the manifest weight of the evidence. In the second assignment of error, he argues that neither his convictions nor the gun specifications are supported by sufficient evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 17} "[T]he test for sufficiency requires a determination of whether the prosecution met its burden of production at trial." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 18} In contrast to sufficiency, "[w]eight of the evidence [involves] 'the inclination of the *greater amount of credible evidence.*'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1433 (6th Ed.1990). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally

sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 19} In conducting such a review, the Ohio Supreme Court has stated that the appellate court "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of conflicting testimony." *Id.* at 546-547, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The Supreme Court's characterization of the appellate court as a "thirteenth juror" refers to the appellate court's "'discretionary power to grant a new trial.'" *Id.* at 347, quoting *Martin* at 175. As a "thirteenth juror," the appellate court may disagree with the factfinder's resolution of the conflicting evidence and, in effect, create a deadlocked jury, which requires a new trial.

{¶ 20} However, our status as a "thirteenth juror" is not equal to the other twelve jurors, who are uniquely positioned to view the witnesses' demeanor, gestures, facial expressions, and voice inflections. These outward behaviors are not

evident in a written transcript. Demeanor is not what the witness says, but the manner in which he or she says it. Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals. It is for this reason that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 21} "'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses;" we must afford substantial deference to its determinations of credibility.'" *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, *State v. Konya*, 2d Dist. Montgomery No. 21434, 2006-Ohio-6312, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 4 (Aug. 22, 1997).

{¶ 22} Although we have the discretionary power of a "thirteenth juror" to grant a new trial, that power "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 547, quoting *Martin* at 175. "[A] finding that a conviction [was] supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Robinson*, 8th Dist. Cuyahoga No. 96463, 2011-Ohio-6077.

{¶ 23} Lorenzo was convicted of four counts of felonious assault in violation of R.C. 2903.11(A)(2), which required the state prove that he "knowingly cause[d] or attempt[ed] to cause serious physical harm to another * * * by means of a deadly

weapon or dangerous ordnance." The indictment specifically alleged that he attempted to cause serious physical harm to Jaleesa and her children with "a gun."

{¶ 24} The jury further found Lorenzo guilty of the one- and three-year firearm specifications, in violation of R.C. 2941.141(A) and 2941.145(A), attendant to those counts. R.C. 2941.141(A) governs the one-year firearm specification and requires the jury to find that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." R.C. 2941.145(A) governs the three-year firearm specification and requires the jury to find that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 25} Finally, Lorenzo was convicted of discharging a weapon on or near a prohibited premises in violation of R.C. 2923.162(A)(3), which states, in relevant part, that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway."

{¶ 26} In order to maintain a conviction for felonious assault by shooting a gun as alleged in the indictment and for discharging a weapon on or near a prohibited premises, the state had to prove that Lorenzo used an operable firearm.[1]

---

[1] An inoperable weapon can still be considered a deadly weapon if it can be used as a bludgeon. *State v. Johnson*, 8th Dist. Cuyahoga No. 90449, 2008-Ohio-4451, ¶ 14. However, in this case, the state alleged that Lorenzo committed felonious assault by shooting at the victims.

Discharging the firearm was an element of each of those offenses. The guilty findings on the firearm specifications also required the state to prove that the firearm was operable. *State v. Patterson*, 10th Dist. Franklin No. 15AP-117, 2016-Ohio-7130, ¶ 49.

{¶ 27} Lorenzo argues there is no evidence, much less credible evidence, that he fired a gun at the victims because there was no testimony that Jaleesa ever saw a gun in Lorenzo's possession. He contends his convictions are "dependent upon the victim's testimony that she heard what she believed to be gunshots." (Appellant's brief at 6.) He also asserts there were no bullet holes in Jaleesa's car and that "it is just as likely that the Appellant fired a cap gun as it is that he fired an actual firearm." (Appellant's brief at 6.)

{¶ 28} Despite Lorenzo's argument to the contrary, Jaleesa testified that she saw Lorenzo fire the gun at her. She stated, in relevant part: "I hear a gunshot, and as I'm going up 123rd, I see Lorenzo shooting at my car right behind my car." (Tr. 606.) Jaleesa later stated: "I kind of, like, looked over, because I heard gunshots too, and I kind of, like — when I hit the corner, I saw him running and shooting." (Tr. 609.) Therefore, there was direct evidence that Jaleesa saw Lorenzo fire the gun at her car, which was occupied by herself and her three children. Therefore, there was also direct evidence that the firearm was operable.

{¶ 29} Circumstantial evidence corroborates Jaleesa's testimony. Dashae told Sergeant Schwebs that someone was chasing and shooting at Jaleesa. When he encountered Jaleesa at the McDonald's a few minutes later, "she was very

frantic." (Tr. 911.) Sergeant Schwebs testified that Jaleesa was "short of breath," and "definitely appeared scared." (Tr. 913.) He also stated that Jaleesa's children were crying and appeared "shook up." (Tr. 912.) These behaviors are consistent with her reports that Lorenzo shot at her a short time earlier.

{¶ 30} Dashae and Janet also testified that they spoke with Jaleesa on the phone while Lorenzo was chasing her and shooting at her. They both testified that they heard gunshots through the phone. Dashae stated that Jaleesa was screaming: "They're trying to kill me, they're shooting at my car." (Tr. 711.) When Dashae asked who was shooting, Jaleesa replied: "Lorenzo." (Tr. 711.) And Janet testified that she saw Lorenzo running with "a long-nosed revolver in his hand." (Tr. 839.) Therefore, at least two witnesses testified that they saw Lorenzo in possession of a gun, Jaleesa testified that she saw Lorenzo shoot the gun at her and her children, and three witnesses testified that they heard gunshots.

{¶ 31} Although the two shell casings found at the scene belonged to Janet's 9 mm semiautomatic handgun and no other shell casings were found at the scene, two witnesses experienced with firearms testified that revolvers do not expel shell casings when they are fired. Therefore, the fact that police did not find any shell casings expelled from Lorenzo's gun is of no consequence. Witness testimony provided competent, credible evidence to support the jury's finding that Lorenzo fired a gun across the roadway at Jaleesa's car while she was driving. There was, therefore, competent credible evidence to support Lorenzo's four felonious assault

convictions with the attendant firearm specifications and his discharging a weapon on or near a prohibited premises conviction.

{¶ 32} The first and second assignments of error are overruled.

{¶ 33} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, J., CONCURS IN JUDGMENT ONLY;
MARY EILEEN KILBANE, A.J., CONCURS IN JUDGMENT ONLY WITH SEPARATE ATTACHED OPINION

MARY EILEEN KILBANE, A.J., CONCURRING IN JUDGMENT ONLY:

{¶ 34} I concur with the majority's disposition of Hester's assignments of error. I agree that there is sufficient evidence to support his convictions and the convictions are not against the manifest weight of the evidence. In light of this court's recent opinion in *State v. Metz*, 8th Dist. Cuyahoga Nos. 107212, 107246,

107259, 107261, 2019-Ohio-4054, I write separately because I disagree with the manifest weight standard of review applied by the majority.

{¶ 35} In *Metz*, the concurring in part and dissenting in part opinion by Judge Sean C. Gallagher noted that:

> The majority and concurring decisions to overrule the defendants' weight-of-the-evidence argument, based on the claim that the finder of fact "was in the best position to assess [the witnesses'] credibility," is misplaced — the incorrect standard is being used. By deferring to the trier of fact's credibility determinations, which weighed in the state's favor in light of the verdict, the majority is essentially performing a sufficiency-of-the-evidence review in which all credibility determinations are found in favor of the state. It may well be time that the Ohio Supreme Court review the continued use of *DeHass*, or a similar sufficiency case, within the weight-of-the-evidence standard of review. Regardless, the majority and concurring decisions ignore the *Thompkins* standard and simply defer to the trial court's weighing of the evidence and credibility determinations.

*Id.* at ¶ 129.

{¶ 36} In the instant case, the majority states that our status as a "thirteenth juror" is not equal to that of the 12 jurors, "who are uniquely positioned to view the witnesses' demeanor, gestures, facial expressions, voice inflections." While I agree that these observations are not readily evident in the cold transcript and we must afford deference to the trier of fact's credibility determinations, appellate courts do not defer to the trier of fact when reviewing the weight of the evidence. Rather, this deference is applicable when reviewing the sufficiency of the evidence. In a manifest weight review, we sit as the thirteenth juror with the ability to disagree with the factfinder's resolution of the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 546-547, 678 N.E.2d 541 (1997).

{¶ 37} The majority cites to *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), and *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, in overruling Hester's manifest-weight-of-the-evidence review. However, *DeHass* and *Barberton* specifically applied to the sufficiency-of-the-evidence analysis. *DeHass* at 234 (after setting forth the deferential standard, the court found that "[i]n conclusion, * * * there was evidence sufficient to support the verdict)" and *Barberton* at ¶ 23 ([a] police officer's unaided visual estimation of a vehicle's speed is sufficient evidence to support a conviction for speeding).

{¶ 38} For these reasons, I disagree with the manifest weight standard of review applied by the majority. *Metz* at ¶ 121-129. Nonetheless, I agree that the convictions should be affirmed. After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, I cannot conclude the "jury lost its way" and created a manifest miscarriage of justice to warrant a reversal. I concur with the remainder of the majority's opinion.