[Cite as *State v. McLoyd*, 2023-Ohio-4306.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                 :

                                     No. 112092

    v.                                             :

TAMARA MCLOYD,                               :

    Defendant-Appellant.             :

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  November 30, 2023

Criminal Appeal from the Cuyahoga County Common Pleas Court
Case Nos.  CR-22-666570-A and CR-22-669473-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Kevin Filiatraut, Assistant Prosecuting
Attorney, *for appellee.*

Michael Gordillo, *for appellant*

ANITA LASTER MAYS, A.J.:

{¶ 1}   Defendant-appellant Tamara McLoyd ("McLoyd") appeals her convictions and sentence and asks this court to reverse her convictions, vacate her sentence, and remand to the trial court for a new trial.  We affirm.

{¶2} McLoyd is appealing two lower court cases that were joined for trial; CR-22-666570-A ("666570") and CR-22-669473-A ("669473"). In 666570, McLoyd was found guilty of two counts of aggravated murder, unclassified felonies, in violation of R.C. 2903.01(A) and (B); two counts of murder, unclassified felonies, in violation of R.C. 2903.02(B); one count of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(1); two counts of felonious assault, first-degree felonies, in violation of R.C. 2903.11(A)(1) and (2); one count of grand theft, a fourth-degree felony, in violation of R.C. 2913.02(A)(2); one count of petty theft, a first-degree misdemeanor, in violation of R.C. 2913.02(A)(4); and one count of having weapons while under disability, a third-degree felony, in violation of R.C. 2923.13(A)(2). One-, three-, and seven-year firearms specifications and forfeiture specifications were attached to the aggravated murder, murder, aggravate robbery, felonious assault, and grand theft counts, while forfeiture specifications were attached to the petty theft and having weapons while under disability counts.

{¶3} In 669473, McLoyd was found guilty of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(1); and having weapons while under disability, a third-degree felony, in violation of R.C. 2923.13(A)(2). The aggravated robbery count had one- and three-year firearms specifications attached to it. After a jury trial that heard the majority of the counts and a bench trial that considered

the having weapons while under disability counts, McLoyd was found guilty of all counts and sentenced to life in prison with the possibility of parole after 47 years.

## I.     Facts and Procedural History

{¶4} On December 25, 2021, Raphael Hernandez ("Hernandez") was in the parking lot of the Cross Creek Apartments.  Hernandez had recently signed a lease and was in the process of moving in.  Hernandez was unloading his suitcases from his vehicle and observed two individuals walking towards him.  Hernandez spoke to them, and one of the individuals responded to him stating, "give me the keys."  This individual also brandished a gun and was wearing a mask.  Hernandez could not tell if the person was a man or woman, but was able to determine that the individual was African-American.

{¶5} Hernandez gave the individual the keys to his vehicle, walked toward his apartment complex, and called 911.  Officers Jacquelyn Grammes ("Officer Grammes") and Anthony Irby ("Officer Irby") responded to the call and were told that a gold Toyota was taken from Hernandez at gunpoint.  Officer Grammes noticed that surveillance cameras were located on the building, but was unable to review the footage at that time because it was Christmas Day.  At the time, Hernandez described the gun color as gray and black, but at trial, testified that the gun was red.  When questioned about the discrepancy, Hernandez explained that he meant he saw two red dots on the gun.

{¶6} On December 31, 2021, Officers Steve Salim ("Officer Salim") and Jessica Rubic ("Officer Rubic") were dispatched to the Cross Creek Apartments. When they arrived, they observed EMS at the apartments. They learned that someone had been shot, later identified as Officer Shane Bartek ("Officer Bartek"), who was in the ambulance and was being transported by EMS to the hospital. Officer Salim was directed to where Officer Bartek's body was found and where his shoes were located. Officer Salim searched for shell casings from the gun used to shoot Officer Bartek, but could not locate them, which indicated to Officer Salim that a revolver could have possibly been used to shoot Officer Bartek. Officer Salim accessed the surveillance video and observed the shooting along with Detective Jake Simonelli ("Det. Simonelli").

{¶7} Det. Simonelli observed the surveillance video and confirmed that the shoes and black masks found at the scene belonged to Officer Bartek. He also observed the shooting of Officer Bartek and his car, a Mazda, and cellphone being stolen. Officer Bartek's autopsy was consistent with what Det. Simonelli and Officer Salim observed on the video. Officer Bartek sustained a gunshot wound to the right side of his back, which caused a liter of blood to pool inside of his body. Officer Bartek's injuries and the surveillance video demonstrated that he was fleeing from the assailant, but died within seconds of the shooting after collapsing between two cars.

{¶8} The surveillance video also showed that the assailant, with a gun in hand, approached Officer Bartek from behind, causing Bartek to put both of his hands in the air. Officer Bartek gave items to the assailant with both of his hands and tried to lunge towards the assailant's weapon. However, Officer Bartek missed and fell away and tried to run. The assailant fired in the air and then shot Officer Bartek in the back with the second shot, ran to Officer's Bartek's car, got in, and drove past Officer Bartek, while he was on the ground.

{¶9} Also viewed during this time was the surveillance video from the Hernandez robbery. The video showed that the assailant who brandished a gun and robbed Hernandez was wearing a white face mask and a dark-colored jacket with a white stripe down the arm. The jacket also had a separate dot of color on the left shoulder that was a logo for the jacket.

{¶10} A BOLO[1] was put out for Officer Bartek's vehicle to neighboring cities. Officers from a neighboring police department observed the stolen vehicle and began pursuit. The driver of the stolen Mazda crashed the vehicle, and was detained by police. The driver was identified as Anthony Butler ("Butler") and was brought in for questioning. Detective Michael Legg ("Det. Legg") interviewed Butler who implicated McLoyd, the appellant, in the robbery and homicide of Officer Bartek. Butler also gave Det. Legg access to his Instagram account and cell

---

[1] An acronym used by law enforcement to warn law enforcement or the general public. It means to "be on the lookout."

phone. A search of Butler's cell phone revealed text messages between Butler and another person, Cedrick, facilitating the trading of stolen vehicles. These messages also demonstrated that McLoyd met with Butler to trade Officer Bartek's vehicle the night she robbed and killed him.

{¶11} Detective Conor Odea ("Det. Odea"), a detective with the gang impact unit, was tasked, along with other departments and members of law enforcement, with finding Officer's Bartek's stolen Mazda. Det. Odea was notified that the vehicle had been recovered and that McLoyd was a suspect. Det. Odea looked at McLoyd's Instagram account to attempt to locate her. McLoyd posted a video to her account detailing her current location and the vehicle she was driving. Det. Odea went to the location and observed McLoyd getting into the vehicle at a gas station. McLoyd, and three other occupants of the vehicle, were detained by police and were advised of their *Miranda* rights. Officers located a firearm in the door of the driver's side of the vehicle, where McLoyd was observed sitting. Officers observed that the gun was a stainless-steel revolver with a black handle and a red marking on the sight. Later, ballistics testing showed that the gun, a .357 Magnum revolver had been fired. The bullet recovered from Officer Bartek's body had the same number of lands and grooves as the test-fired bullets from the gun, but the autopsy bullet was too damaged to definitively state the bullet found in Officer Bartek's body came from the gun. Additionally, McLoyd's DNA was found on the revolver.

{¶12} During McLoyd's interrogation, McLoyd admitted to having Officer Bartek's vehicle in her possession six minutes after he was killed, although she initially denied shooting him. However, McLoyd eventually admitted to shooting Officer Bartek. She told officers that she was scared and did not mean to shoot him. McLoyd also told officers that she changed clothes at a friend's house that evening after the shooting. McLoyd's DNA was found on these clothes, and they were consistent with what officers observed her wearing on the surveillance video at the time of the shooting.

{¶13} Officers also searched McLoyd's Instagram account for further evidence. They discovered that on the night Hernandez's car was stolen, McLoyd posted messages suggesting that she was looking for a car to steal. Later, around the time of the theft, she posted that she stole a car from the west side, where the Cross Creek Apartments are located. Also, McLoyd posted videos and photos of herself wearing the same outfit the assailant was observed wearing in the surveillance video on December 25, 2021, at the time of the Hernandez robbery. The photos also showed a dashboard of a Toyota Corolla, the same make and model of the car stolen from Hernandez.

{¶14} After McLoyd was booked and processed in the county jail, she called her mother on a recorded phone call where she admitted to killing Officer Bartek. She also confirmed that the Instagram account being used as evidence of both

robberies was hers. She admitted that Officer Bartek was on the ground when she shot him.

{¶15} On January 7, 2022, McLoyd was indicted for the robbery and homicide of Officer Bartek. On March 13, 2022, McLoyd filed a motion to suppress her video-recorded statement that was made after she was mirandized and taken into police custody. On April 22, 2022, McLoyd was indicted for the robbery of Hernandez. On May 26, 2022, the state filed a motion to join the two indictments for trial, and McLoyd objected to joinder. On May 27, 2002, there was hearing on McLoyd's motion to suppress her statements to the police. However, McLoyd instructed her trial counsel to withdraw the motion.

{¶16} On June 3, 2022, the trial court granted the state's motion for joinder of indictments for one trial. Journal entry No. 124459514 (Jun. 3, 2022). In the trial court's judgment entry, granting the state's request, it states:

> If the evidence at trial comes in as expected by the prosecution then the defendant will not be able to demonstrate prejudice because one subset of the evidence will be dedicated to proving the events of Christmas Day and the other subset of the evidence will go towards proof beyond a reasonable doubt of the aggravated murder and robbery on New Year's Eve. In the absence of such prejudice, joinder of the indictments is appropriate and the State of Ohio's motion to join the indictments in case numbers CR 22-666570 and CR 22-669473 is granted.

*Id.*

{¶17} McLoyd was found guilty on all counts and sentenced to life in prison. She filed this appeal assigning seven errors for our review:

1.  The trial court prejudiced appellant and committed reversible error by incorrectly advising the petite jury that the grand jury's indictment meant that the grand jury found appellant was more likely than not guilty;

2.  Joinder of the cases for trial was impermissibly prejudicial to the appellant;

3.  Appellant's convictions were not supported by sufficient evidence;

4.  Appellant's convictions are against the manifest weight of the evidence;

5.  The trial court committed reversible error prejudicing appellant by permitting hearsay testimony into evidence;

6.  Appellant's trial counsel was ineffective; and

7.  The trial court committed reversible error prejudicing the appellant when it imposed an unconstitutional sentence upon appellant pursuant to the Reagan Tokes law.

## II.  Jury Advisement

{¶18} In McLoyd's first assignment of error, she argues that the trial court prejudiced her and committed reversible error by incorrectly advising the petit jury that the grand jury's indictment meant that the grand jury found that McLoyd was "more likely than not" guilty.

{¶19} During voir dire, the trial court made the following statements:

An indictment is returned when the prosecutor presents evidence to a grand jury. When the prosecutor presents evidence to a grand jury, that proceeding is almost always one-sided. In other words, the Defendant or Defendants or their representatives are not present at the grand jury proceedings.

Moreover, a grand jury, which is composed of people like yourselves who do this duty for several weeks at a time and hear a fair number of cases, it does not have to be unanimous, and a grand jury is only asked to determine whether there is probable cause to believe that a person suspected of committing a crime committed the crime. If the grand jury does find probable cause to believe that appears more likely than not that the person did commit the crime, then that grand jury returns an indictment and it comes here for your consideration.

* * *

At trial, though, the Defendants are presumed innocent. That presumption stays in place until you as a jury have found that the proof is such as to exclude every reasonable doubt of the guilt of any particular Defendant on a particular charge.

Reasonable doubt is present when after the jurors have carefully considered a charge they cannot say that they are firmly convinced of the truth of a charge. Reasonable doubt is a doubt based upon reason and common sense. Reasonable doubt is not mere possible doubt, because everything related to human affairs or dependent upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her affairs.

Tr. 159–161.

**{¶20}** McLoyd contends that the trial court's instruction was erroneously given because "probable cause" and the words "probable" and "probably" do not have the same meaning. Because the probable cause standard does not have a quantification into percentages, it depends on the totality of the circumstances. She further argues that she was entitled to a presumption of innocence, and the state has the burden of production regarding the elements of a criminal offense.

**{¶21}** McLoyd, however, did not object to this instruction at trial, and thus has waived all but a plain error review on appeal. "Generally, '[i]f the defendant failed to raise an error affecting substantial rights at trial, an appellate court reviews the error under the plain error standard in Crim.R. 52(B).'" *State v. Pugh*, 8th Dist. Cuyahoga No. 111099, 2022-Ohio-3038, ¶ 17, quoting *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14. "A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse effect on the character and public confidence in judicial proceedings." *Id.*, citing *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982).

**{¶22}** The trial court clearly explained the reasonable doubt standard to the jury and stated that defendants are presumed innocent. McLoyd has not demonstrated that the trial court's statements had a materially adverse effect on the proceedings or prejudiced her in anyway.

**{¶23}** Therefore, McLoyd's first assignment of error is overruled.

## III. Joinder of Cases

### A. Standard of Review

**{¶24}** "We review the trial court's decision not to sever the indictments for an abuse of discretion." *State v. Davenport*, 8th Dist. Cuyahoga Nos. 112004 and 112005, 2023-Ohio-2953, ¶ 30, citing *State v. Torres*, 66 Ohio St. 2d 340, 343, 421 N.E.2d 1288 (1981). "The Ohio Supreme Court recently explained that an abuse of

discretion 'involves more than a difference in opinion * * *.'" *State v. Price*, 8th Dist. Cuyahoga No. 111921, 2023-Ohio-3790, ¶ 32, quoting *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, ¶ 24. "That is, a trial court's judgment that is 'profoundly and wholly violative of fact and reason' constitutes an abuse of discretion." *Id.*

**B.     Law and Analysis**

**{¶25}** In McLoyd's second assignment of error, she argues that the joinder of the cases for trial was impermissibly prejudicial.  "Preliminarily, the law favors joinder of multiple offenses in a single trial if the offenses charged 'are of the same or similar character.'"  *Davenport* at ¶ 27 quoting *Torres* at 343; Crim.R. 13; Crim.R. 8(A).  "Joinder is favored because it offers the benefits of 'conserving time and expense, diminishing the inconvenience of witnesses and minimizing the possibility of incongruous results in successive trials before different juries.'"  *Id.*  "Crim.R. 13 allows two different indictments to be tried together 'if the offenses * * * could have been joined in a single indictment or information.'"  *Id.*  Crim.R. 8(A) allows offenses to be joined in a single indictment where they "are of the same or similar character, or are based on the same act or transaction," "or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."  *Id.*

> **{¶26}** Here, in the instant case, the trial court reasoned that
>
> [t]hese offenses occurred exactly one week apart.  Both offenses involved the use of a gun [with] the object of the robbery being the vehicle controlled by the victim.  Both offenses occurred at the same relative time of day (late afternoon) and at the same location — the Cross Creek Apartment complex.  Both offenses involved the same video system recording the events.

Judgment entry Nos. 666570 and 669473.

{¶27} "The Supreme Court has noted that a continuing course of criminal conduct is found when the evidence interlocks and the events occur in close proximity in location and time; or when the offenses are part of a common scheme or plan and similarly, occur over a short period of time." *Davenport* at ¶ 28. *See also State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988); *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 62.

{¶28} McLoyd argues that she was prejudiced by the joinder under Crim.R. 14. Crim.R. 14 provides, in relevant part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, information or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

{¶29} "When challenging joinder under Crim.R. 14, the appellant 'has the burden of affirmatively showing that his rights were prejudiced.'" *Davenport* at ¶ 30, quoting *Torres*, 66 Ohio St.2d 340, 343. "Appellant also bears the burden of providing sufficient information to the trial court 'that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *Id.*

{¶30} "However, a claim of prejudicial joinder may be rebutted by showing either 1) the evidence in the joined cases could be introduced in separate trial as 'other acts' evidence under Evid.R. 404(B); or (2) by showing that the evidence as

to each crime is simple and direct." *Id.* at ¶ 32, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 96.

{¶31} In this case, we determine that the evidence was simple and direct. McLoyd argues that the evidence concerning the assailants who robbed Hernandez was lacking and the video surveillance of the Bartek killing was insufficient quality. However, McLoyd's arguments are misplaced. There were messages on McLoyd's phone implicating her in the Hernandez robbery. There were pictures and videos of McLoyd wearing the same clothes of the assailant in the surveillance video on her Instagram.

{¶32} Additionally, McLoyd confessed to the police that she shot Officer Bartek. Her DNA was found on the gun used in the shooting as well as on the clothes she wore the night of shooting. McLoyd also confessed to her mother that she shot Officer Bartek during a recorded call from the jail. Text messages on Butler's phone implicated McLoyd in both robberies. McLoyd has failed to demonstrate how she was prejudiced by the joinder of the cases.

{¶33} Therefore, McLoyd's second assignment of error is overruled.

## IV. Sufficiency and Manifest Weight of the Evidence

### A. Standard of Review

{¶34} "Although the terms 'sufficiency' and 'weight' of the evidence are 'quantitatively and qualitatively different,' we address these issues together because they are closely related, while applying the distinct standards of review."

*State v. Hester*, 8th Dist. Cuyahoga No. 108207, 2019-Ohio-5341, ¶ 16, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶35}** "'[T]he test for sufficiency requires a determination of whether the prosecution met its burden of production at trial.'" *Id.* at ¶ 17, quoting *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶36}** "In contrast to sufficiency, '[w]eight of the evidence [involves] the inclination of the greater amount of credible evidence.'" *Id.* at ¶ 18, quoting *Thompkins* at 387. "While 'sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "'In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.*, citing *Thompkins* at 387. "The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered.'" *Id.,* quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

**{¶37}** "In conducting such a review, the Ohio Supreme Court has stated that the appellate court 'sits as a thirteenth juror' and disagrees with the factfinder's resolution of conflicting testimony.'" *Id.* at ¶ 19, quoting *Thompkins* at 546-547. "The Supreme Court's characterization of the appellate court as a 'thirteenth juror' refers to the appellate court's 'discretionary power to grant a new trial.'" *Id.* quoting *Thompkins* at 387. "As a 'thirteenth juror,' the appellate court may disagree with the factfinder's resolution of the conflicting evidence and, in effect, create a deadlocked jury, which requires a new trial." *Id.*

**{¶38}** "However, our status as a 'thirteenth juror' is not equal to the other twelve jurors, who are uniquely positioned to view the witnesses' demeanor, gestures, facial expressions, and voice inflections." *Id.* at ¶ 20. "These outward behaviors are not evident in a written transcript. Demeanor is not what the witness says, but the manner in which he or she says it." *Id.* "Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals." *Id.* "It is for this reason that 'the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts.'" *Id.,* quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶39}** "'Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses;' we must afford substantial deference to its determinations of credibility.'" *Id.* at ¶ 21, quoting *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20.

**{¶40}** "Although we have the discretionary power of a 'thirteenth juror' to grant a new trial, that power 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at ¶ 22, quoting *Thompkins* at 547. "'[A] finding that a conviction [was] supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.'" *Id.* quoting *State v. Robinson*, 8th Dist. Cuyahoga No. 96463, 2011-Ohio-6077.

## B.    Law and Analysis

**{¶41}** In McLoyd's third and fourth assignment of errors, she argues that her convictions are not support by sufficient evidence and they are against the manifest weight of evidence. Specifically, McLoyd argues that the evidence was insufficient to conclude that she was the one who robbed Hernandez. She also contends that text messages from her phone were hearsay, and therefore impermissible evidence. Further, she argues that without these messages, there was not a link between her and Bartek's robbery and murder.

**{¶42}** Circumstantial evidence corroborates the information taken from Butler and McLoyd's phones, surveillance videos from both robberies, and autopsy

and ballistics reports, in addition to McLoyd's own statements to the police and her mother. "It is well established that the elements of an offense may be proven by direct evidence, circumstantial evidence, or both." *State v. Kyle*, 8th Dist. Cuyahoga No. 108702, 2020-Ohio-3281, ¶ 26. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Id.*, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. "Circumstantial evidence, on the other hand, is evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Id.*, quoting *Cassano*, at ¶ 13. *See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.").

{¶43} "Circumstantial and direct evidence are of equal evidentiary value." *Id.* at ¶ 27, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. "'Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence.'" *Id.*, quoting *Cassano*, at ¶ 13. "In some cases, circumstantial evidence may be 'more certain, satisfying and persuasive than direct evidence.'" *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990).

{¶44} As previously stated, the surveillance video from the Hernandez robbery showed that the assailant who brandished a gun and robbed Hernandez, was wearing a white face mask and a dark-colored jacket with a white stripe down the arm. The jacket also had a separate dot of color on the left shoulder that was a logo for the jacket. McLoyd posted videos and photos of herself wearing the same outfit the assailant was observed wearing in the surveillance video on December 25, 2021, at the time of the Hernandez robbery. The photos also showed a dashboard of a Toyota Corolla, the same make and model of the car stolen from Hernandez.

{¶45} As it pertains to the murder of Officer Bartek, McLoyd confessed to the police that she shot Officer Bartek stating that it was an accident and she was scared. Her DNA was found on the gun used in the shooting as well as on the clothes she wore the night of shooting. McLoyd also confessed to her mother that she shot Officer Bartek during a recorded call from the jail. Text messages on Butler's phone implicated McLoyd in both robberies. There was sufficient evidence to demonstrate that McLoyd robbed Hernandez and killed Officer Bartek.

{¶46} Additionally, McLoyd's convictions were not against the manifest weight of the evidence. McLoyd has not demonstrated that the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Given the evidence stated above, McLoyd also has not demonstrated that the evidence weighs heavily against her convictions.

She does not cite conflicting testimony or identify testimony that was not credible. She only argues that the evidence should not have reached the jury. Her arguments regarding the permissibility of the evidence are addressed in the review of the next assignment of error.

{¶47} Therefore, McLoyd's third and fourth assignments of error are overruled.

## V. Hearsay

### A. Standard of Review

{¶48} "We review evidentiary rulings that implicate the Confrontation Clause de novo." *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056 (8th Dist.), ¶ 60, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶49} However, "[a] trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay." *In re A.M.*, 8th Dist. Cuyahoga No. 110551, 2022-Ohio-612, ¶ 22, citing *Solon v. Woods*, 8th Dist. Cuyahoga No. 100916, 2014-Ohio-5425, ¶ 10. "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion." *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984).

### B. Law and Analysis

{¶50} In McLoyd's fifth assignment of error, she argues that the trial court committed reversible error by permitting hearsay testimony into evidence. First, McLoyd contends that admitting Hernandez's 911 call was impermissible. She argues that the 911 call was a testimonial, out-of-court statement offered for its truth, and not subject to cross-examination.

{¶51} Preliminarily, we note that McLoyd did not object to the admission of the text messages or the 911 call during the trial, and thus, we review only for plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the case. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶52} "'911 calls are generally admissible as excited utterances or under the present sense impression exception to the hearsay rule.'" *Cleveland v. Myles*, 8th Dist. Cuyahoga No. 111309, 2022-Ohio-4504, ¶ 25, quoting *State v. Martin*, 2016-Ohio-225, 57 N.E.3d 411, ¶ 59 (5th Dist.).

{¶53} "Evid.R. 803(1) defines the present sense impression as '[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness.'" *Id.* at ¶ 26, quoting Evid.R.

803(1). "Regarding Evid.R. 803(1), '[t]he key to the statement's trustworthiness is the spontaneity of the statement; it must be either contemporaneous with the event or be made immediately thereafter.'" *Id.*, quoting *State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429, ¶ 126 (8th Dist.). "'The principle underlying this hearsay exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of trustworthiness.'" *Id.*, quoting *State v. Dixon*, 152 Ohio App.3d 760, 2003-Ohio-2550, 790 N.E.2d 349, ¶ 12 (3d Dist.). "Accordingly, 'Ohio courts have routinely held that 911 calls are admissible as present sense impressions.'" *Id.,* quoting *Ohio v. Scott*, 1st Dist. Hamilton Nos. C-200385 and C-200403, 2021-Ohio-3427, ¶ 17. *See also State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 37 (1st Dist.) ("911 calls are usually admissible under the excited utterance or the present sense impression exception to the hearsay rule").

**{¶54}** "'While temporal proximity is critical to a present sense impression analysis, there is no bright line rule as to what amount of elapsed time precludes a finding that the exception applies.'" *Id.* at ¶ 27, quoting *State v. May*, 3d Dist. Logan No. 8-11-19, 2012-Ohio-5128, ¶ 42. "Some courts have found that the present sense impression exception applies even where the 911 call is made up to an hour after the event perceived." *Id.*, citing *State v. Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 37 (2d Dist.).

{¶55} In this case, the surveillance video demonstrates that the robbery of Hernandez occurred at approximately 4:20 p.m. Hernandez immediately called 911, and by 4:30 p.m., officers were dispatched to the scene. Given this evidence, Hernandez's 911 call is admissible as an excited utterance or under the present sense impression exception to the hearsay rule. McLoyd's argument that Hernandez was no longer in danger is misplaced and is not a factor is determining whether the call is testimonial in nature.

{¶56} Second, McLoyd contends that the Instagram messages between Butler and Cedric were inadmissible because McLoyd was not a part of the conversation. McLoyd also argues that these messages were used to form a key part of the state's evidence that she was the individual who robbed and killed Officer Bartek. However, McLoyd's own confession to the police and her mother that she killed Officer Bartek were the key part of the state's evidence. These messages were not admitted to demonstrate McLoyd robbed and killed Officer Bartek, but rather to explain why the police asked McLoyd about the messages when she confessed. The trial court did not allow any testimony about the specifics of the interview with Butler. While observing the video of McLoyd's interrogation during the trial, the police were shown asking McLoyd about the information gathered from Butler's messages. His actual messages were not entered into evidence. Tr. 803.

**{¶57}** After reviewing this assignment of error for plain error, we cannot conclude, given the evidence, that an error occurred.

**{¶58}** Therefore, McLoyd's fifth assignment of error is overruled.

## VI. Ineffective Assistance of Counsel

### A. Standard of Review

**{¶59}** "In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense." *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 62, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶60}** "This court has held that to establish ineffective assistance of counsel for failure to file a motion to suppress, one must prove that: (1) there was a basis to suppress the evidence in question and (2) that failure to file the motion to suppress caused prejudice." *State v. Marneros*, 8th Dist. Cuyahoga No. 109258, 2021-Ohio-2844, ¶ 17, citing *State v. Garcia*, 8th Dist. Cuyahoga No. 94386, 2010-Ohio-5780, ¶ 8; *State v. Robinson*, 108 Ohio App.3d 428, 433, 670 N.E.2d 1077 (3d Dist.1996). "Failure to file a motion to suppress is not per se ineffective assistance of counsel." *Id.*, citing *Garcia* at ¶ 8 (citations omitted). "Put simply, failure to file a motion to suppress constitutes ineffective assistance of counsel only

if the motion would have been granted." *Id., citing State v. Willis*, 8th Dist. Cuyahoga No. 89044, 2008-Ohio-444, ¶ 48 (citations omitted).

## B. Law and Analysis

{¶61} In McLoyd's sixth assignment of error, she argues that her trial counsel was ineffective because he withdrew her motion to suppress. On March 13, 2022, McLoyd filed a motion to suppress her video-recorded statement that was made after she was mirandized and taken into police custody. According to the record, McLoyd made the decision to withdraw the motion. The record reflects that McLoyd orally withdrew the motion at the hearing.

{¶62} "A criminal defendant has the right to effective assistance of counsel." *State v. Debose*, 8th Dist. Cuyahoga No. 109531, 2022-Ohio-837, ¶ 20, citing *Strickland v. Washington*, 466 U.S. 668, 685-686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The Sixth Amendment to the United States Constitution guarantees a defendant the effective assistance of counsel at all 'critical stages' of a criminal proceeding, including sentencing." *Id.*, citing *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio- 309, 146 N.E.3d 560, ¶ 7 ("sentencing is a critical stage in which a felony offender has a right to counsel").

{¶63} "To constitute ineffective assistance of counsel, the errors complained of must amount to 'a substantial violation of * * * defense counsel's essential duties to his client.'" *Id.* at ¶ 23, quoting *State v. Bradley*, 42 Ohio St.3d 136, 141, 538 N.E.2d 373 (1989).

As a general matter, to establish ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the outcome of the proceeding would have been different. *Strickland* at 687-688, 694; *Bradley*, at paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

*Id*. at ¶ 21.

**{¶64}** McLoyd's has not demonstrated that she was prejudiced by counsel's decision to withdraw the motion to suppress. The trial court's journal entry states, in part: "This case was called on 5/27/2022 for a hearing on the defendant's 3/13/2022 motion to suppress evidence. The defendant orally withdrew the motion." Journal entry No. 124183087 (May 31, 2022). She also does not demonstrate any evidence that the motion would have been successful if the hearing moved forward.

**{¶65}** Therefore, McLoyd's sixth assignment of error is overruled.

## VII. Reagan Tokes Law

**{¶66}** In McLoyd's seventh assignment of error, she challenges the application of the Reagan Tokes Law to her sentence. McLoyd's assignment of error is overruled pursuant to the decision in *State v.Hacker*, Slip Opinion No. 2023-Ohio-2535, where the Ohio Supreme Court recently addressed similar arguments and found the Reagan Tokes Law to be constitutional. The *Hacker*

Court determined the law does not violate the separation-of-powers doctrine, the right to a jury trial, or the right to due process. *Id.* at ¶ 41.

{¶67} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., CONCURS;
FRANK DANIEL CELEBREZZE, III, J., CONCURS (WITH SEPARATE OPINION)


FRANK DANIEL CELEBREZZE, III, J., CONCURRING:

{¶ 68} I concur fully with my esteemed colleagues in the majority opinion. I write separately to express my dismay and exasperation with the current state of gun control in the state of Ohio. The erosion of gun control in Ohio has placed more deadly weapons in the hands of inexperienced and unqualified people to the detriment of not only ordinary civilians, but all public servants.

{¶ 69} To begin, I want to express in no uncertain terms that I am an ardent supporter of both the Ohio Constitution, Article I, Section 4, that provides the right

of people to "bear arms for their defense and security" and the Second Amendment to the U.S. Constitution, that protects "the right of the people to keep and bear Arms[.]"  Additionally, my life experiences put me in a position to speak on this issue.  I am a Navy veteran who served as intelligence during the Vietnam War.  I am a member of the National Rifle Association.  Since my election to the common pleas bench in 1992, and then the appellate bench in 2001, I have been an Ohio jurist that is passionate about stare decisis and a dedicated follower of the strict constructionism legal philosophy.  Throughout my career on the bench, I have handled cases involving gun violence, but I have recently noticed a glaring frequency in the amount of these cases, especially where the violence has been directed at public servants, including police officers, firefighters, my fellow jurists, and my colleagues of the Ohio bar.  I can no longer remain silent.  The prevalence of guns and their increased usage in violent crimes, especially by young people, mandates checks by the General Assembly on gun ownership and usage.

{¶ 70} In this case, McLoyd was 18 years old at the time she wielded a Smith & Wesson .357 magnum revolver and fatally shot Officer Bartek, even after he handed over his keys and phone — he had nothing else to give her.  She shot him in his back when he presented no danger or threat to her.  She later flaunted the same weapon in an Instagram video and referred to someone "getting popped."  Because of McLoyd's cavalier attitude towards handguns, 25-year-old Officer Bartek, who

had his entire life and career in law enforcement ahead of him, left behind a grieving family, including a mother, grandmother, brother, and twin sister.

{¶ 71} McLoyd, at only 18 years old, was not permitted to purchase a handgun under R.C. 2923.211(B), which precludes the sale of handguns to individuals under 21 years of age who are not law enforcement officers or members of the armed services.[2] No individual or seller of handguns was permitted to furnish the handgun to her under R.C. 2923.21(A)(3). Nonetheless, as explained below, McLoyd was easily able to obtain a handgun due to the relaxed laws surrounding gun ownership in Ohio.

{¶ 72} In recent years, Ohio has gradually loosened gun-control measures to the detriment of civilians and public servants alike. As of June 2022, adults need not obtain concealed handgun licensure or obtain a background check to purchase a firearm. R.C. 2923.111. Moreover, Ohio does not have any "red flag" laws that authorize courts to remove guns from individuals deemed to be imminent risks to themselves or others, whether that risk is the result of mental health issues, alcoholism, drug dependency, or criminal history. Red flag laws have been passed in many states all along the political spectrum, such as California, Colorado, Florida, Maryland, and Virginia. Safety is not a partisan issue.

---

[2] The irony is not lost on me that McLoyd, at 18 years old, would have been legally permitted under Ohio law to purchase a semiautomatic assault rifle and high-capacity magazines, but not a handgun.

{¶ 73} In addition, Ohio law does not require any training to carry a concealed weapon. As a result, deadly weapons are in the hands of inexperienced, untrained individuals who use guns to intimidate others or as an aid in criminal activity, rather than for personal defense and security, as the Ohio Constitution provides.

{¶ 74} Restrictions on gun ownership not only promote the safety of our civilians and society as a whole but protect those who have devoted their lives to serving Ohio. There are a variety of public servants, but I am most concerned about those whose jobs are entrenched in the community, such as police officers, firefighters, members of the judiciary, and other government agents. I have no doubt that the increased gun violence and failure of the General Assembly to place restrictions on gun ownership has deterred many well-qualified and well-meaning individuals from seeking a career in public service, or has caused individuals who have offered their services to seek other employment. Not only does this disinterest or fear of public service perpetuate the very crimes we are trying to prevent, it prevents otherwise well-qualified, talented, and educated people from dedicating their lives to the service of our state.

{¶ 75} One month ago, I presided over *State v. Hatcher*, 8th Dist. Cuyahoga No. 112552, 2023-Ohio-3884, where a firefighter was merely doing his job and investigating a potential fire hazard, when an individual brandished a gun. The firefighter and his team were not only prevented from investigating the hazard, but

they became fearful for their lives.  During the same week that *Hatcher* was released, a trial judge in Washington County, Maryland, was shot and killed in his own driveway, while his wife and son were in the house, by an aggrieved party in a child custody case.  These are just two recent examples among countless others, but the violence against public servants speaks for itself.

{¶ 76} We cannot know whether gun control measures would have kept the revolver out of McLoyd's hands, but owning and wielding a deadly weapon is a serious responsibility that the General Assembly must use its legislative power to check.  Without these checks to regulate guns, the quantity of firearms in the hands of those with ill-intent is increased.  For the safety of civilians and public servants, the state of Ohio must act to better regulate the sale, distribution, and possession of firearms.