[Cite as *State v. Holliman*, 2025-Ohio-1262.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                                             No. 114286

    v.                                       :

HARRY HOLLIMAN, JR.,                        :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 10, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-688283-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Halie Turigliatti and Chauncey Keller, Assistant Prosecuting Attorneys, *for appellee*.

P. Andrew Baker, *for appellant*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Harry Holliman, Jr. ("Holliman") brings the instant appeal challenging his conviction of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3). On appeal, he challenges his conviction as against the manifest weight of the evidence and challenges the trial court's

imposition of postrelease control. After a thorough review of the relevant law and facts, this court affirms.

## I. Factual and Procedural History

{¶ 2} Holliman was indicted on three counts of felonious assault, improperly discharging a firearm at or into a habitation or a school safety zone, and discharge of firearm on or near prohibited premises. The improper discharge of a firearm on or near prohibited premises provided that Holliman created a substantial risk of physical harm to any person or caused serious physical harm to property, which elevated the offense to a third-degree felony and had attendant one- and three-year firearm specifications.

{¶ 3} A jury trial commenced on June 24, 2024, where the following facts were adduced.

{¶ 4} On December 2, 2023, David Wright ("Wright"), his girlfriend since 1997, Mary Hooks ("Hooks"), and Wright's four-year-old granddaughter were going to the East Cleveland police station to contest traffic tickets. Wright testified that as they were walking into the police station, a vehicle that he believed belonged to Holliman began honking at them. Wright testified that Holliman used to be his friend, but that they had a falling out at some point prior to this incident.

{¶ 5} Shortly after returning from the police station, Hooks went to retrieve the mail immediately next to the front door. She saw Holliman and immediately closed the door, knowing that Wright and Holliman were no longer friends. Holliman then began "banging at the door," so Wright went outside to speak to

Holliman, where he noticed that Holliman's vehicle was backed into the driveway across the street. (Tr. 145 and 150.) According to Wright, Holliman stated that he needed to talk and that they needed closure following the end of their friendship. Wright informed Holliman that he was not interested and walked Holliman down the porch steps. Holliman asked Wright why he was "acting like this" and then started slapping himself in the head. (Tr. 146.) Then, Wright observed Holliman reaching towards his right-side hip pocket, removing a firearm, and firing shots into the air.

{¶ 6} Wright testified that his granddaughter was standing "on my left side and behind me . . . right in the doorway." (Tr. 162.) Wright comforted his granddaughter, who was upset after hearing the shots, and then he called 911. He made the police report on the phone and later presented to the station to provide a written statement. The police also came to Wright's home and photographed the area where the incident occurred.

{¶ 7} One of the bullets was alleged to have gone through the siding of the home near the front door. The police attempted to recover the actual bullet from the siding, but they were unable to either because it had become wedged too far into the wall or because it had fallen under the porch. According to Wright and Hooks, the bullet went through an already-existing BB gun hole in the siding, and increased the size of the hole. They both testified that the smaller BB gun hole was there when they moved into the home, in either 2014 or 2015, and that there were other, similar holes around it.

{¶ 8} Though Wright testified that no one was injured by the bullets, he noted that the incident affected his granddaughter. He explained that his granddaughter is extra cautious when leaving the home, looks up and down the street, and races to get inside of the car as soon as she exits the home, a condition that developed after the shooting.

{¶ 9} The State's final witness, Officer Joshua Durda ("Ofc. Durda") testified that he is an officer for the East Cleveland Police Department. Ofc. Durda received Wright's report on the date of this incident after Wright came into the police station to make a written statement. Ofc. Durda escorted Wright back home, where he investigated the area around the home with two other officers. They were unable to find any shell casings, which Ofc. Durda attributed to the fact that Holliman allegedly used a revolver.

{¶ 10} Ofc. Durda stated that "upon our trying to retrieve the bullet fragment from the home, we removed the siding. And within the insulation, there was dust, which typically would not be there if it was an older bullet hole 'cause the weather would have typically blown the dust away." (Tr. 208.) He noted that upon entry into the insulation, the bullet's trajectory had changed and that they were unable to recover the bullet because "it was too deep within the studs of the home." (Tr. 209.)

{¶ 11} On cross-examination, Ofc. Durda testified about the contents of his report, which revealed that the bullet had traveled into the "exterior sheeting or sheathing and could not be recovered" and was asked why he did not write down his conclusions about the dust in the siding within the report. (Tr. 224.) Ofc. Durda

conceded that he was never told that there had been a preexisting BB hole around the bullet hole. Ofc. Durda denied checking any ShotSpotter[1] technology for evidence that a gun was fired because there were not any ShotSpotter microphones in the area of this incident.

{¶ 12} Holliman's sole defense witness was Richard Cerny, an investigator with the Cuyahoga County Public Defender's Office. Cerny testified that he obtained photos from Google Maps that showed photographs of the home.

{¶ 13} The jury found Holliman guilty of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and that his actions caused a substantial risk of physical harm to any person; the jury also found him guilty of both attendant firearm specifications. Holliman was acquitted of all other counts.

{¶ 14} Holliman was sentenced to nine months plus the one-year firearm specification, for a total of 21 months in prison. The trial court imposed postrelease control for one to three years.

{¶ 15} Holliman's appeal raises two assignments of error:

I. Defendant-appellant's conviction was against the manifest weight of the evidence.

II. The imposition of post-release control must be vacated.

## II. Law and Analysis

{¶ 16} Holliman's first assignment of error contests his conviction of improperly shooting into a roadway as against the manifest weight of the evidence.

---

[1] ShotSpotter is a technology that detects the sound of gunshots.

{¶ 17} A manifest weight challenge questions whether the State met its burden of persuasion at trial. *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.). In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When considering a claim that a conviction is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Id.* We will reverse a conviction as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387. Circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 259 (1991), paragraph one of the syllabus. Circumstantial evidence "requires the drawing of inferences that are reasonably permitted by the evidence." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 18} R.C. 2923.162(A)(3) provides that "[n]o person shall . . . [d]ischarge a firearm upon or over a public road or highway." Holliman argues that the State's case depended almost entirely on witness testimony, because no bullet, gun, casings, or footage of the incident had been recovered. He contends that Wright and Hooks

were not credible witnesses for various reasons, and points specifically to inconsistencies in Wright's testimony to the officers after the incident versus his testimony at trial, as well as inconsistencies between his testimony and Ofc. Durda's testimony.

{¶ 19} After careful review of Holliman's arguments and the record before us, we cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conviction. Wright and Hooks both testified that Holliman was at their front door on the date of the incident and that they were able to identify him because they had known him prior to this incident. Wright and Hooks both corroborated that Holliman and Wright had not been friends at the time of this incident. Wright testified that he saw Holliman shooting, and Hooks testified that she heard three shots fired while she was inside of the home. Ofc. Durda testified that the presence of dust in the siding convinced him that the bullet hole in the home had occurred recently.

{¶ 20} The jury heard evidence regarding the preexisting holes in the siding of the home and saw photographs taken by Google Maps in 2022, showing the hole prior to the incident. The jury also heard evidence that there was no footage of the incident from nearby homes and that no neighbors had been interviewed in connection with the incident. Moreover, the jury was aware that the only physical evidence consisted of photographs of the property damage to the home.

{¶ 21} Based on the foregoing, we overrule Holliman's first assignment of error.

{¶ 22} In his second assignment of error, Holliman contests the trial court's imposition of postrelease control during sentencing, claiming that a violation of R.C. 2923.162 is not an offense where postrelease control was necessary because it is not a first- or second-degree felony, a felony sex offense, or a felony offense of violence.

{¶ 23} This court has previously concluded that R.C. 2923.162(A)(3) is an "offense of violence" in relation to postrelease control. *State v. Gurley*, 2018-Ohio-381, ¶ 12 (8th Dist.). Based on this court's precedent, we overrule Holliman's second assignment of error.

{¶ 24} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR