[Cite as *In re J.G.*, 2025-Ohio-1933.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.G.

A Minor Child

:
:
:

No. 114426

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 29, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL24106664

---

### *Appearances:*

Susan J. Moran, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary Lafleur, Assistant Prosecuting Attorney, *for appellee.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, J.G., appeals an order of the Cuyahoga County Court of Common Pleas, Juvenile Division, adjudicating him delinquent and committing him to the Ohio Department of Youth Services ("ODYS"). He claims the following errors:

> 1. The trial court erred in admitting evidence which was not properly authenticated which deprived the appellant of due process and the right to a fair trial.

2. The trial court erred in admitting testimony regarding the Securus call logs as they were impermissible hearsay.

3. The State committed prosecutorial misconduct when it vouched for the credibility of its witnesses, denying appellant due process and the right to a fair trial.

4. Appellant's convictions are against the manifest weight of the evidence.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} In June 2024, a complaint was filed against J.G alleging offenses that if committed by an adult would constitute one count of aggravated robbery in violation of R.C. 2911.01(A)(1); three counts of robbery in violation of R.C. 2911.02(A)(1), (A)(2), and (A)(3); one count of aggravated menacing in violation of R.C. 2903.21(A); and one count of theft in violation of R.C. 2913.02(A)(1). The aggravated robbery and robbery charges included one- and three-year firearm specifications. The complaint alleged, among other things, that J.G. brandished a firearm while committing a theft offense against K.S.

{¶ 4} K.S.'s mother, S.S., testified at trial that she purchased a pair of Jordan shoes for K.S.'s birthday on StockX, an online retailer. K.S. testified that he was wearing the shoes on April 9, 2024, while he walked with friends, one, two, and three to friend three's house after school. While walking to the house, four individuals wearing ski masks approached K.S. and his friends and asked, "Why your friend keep looking back?" (Tr. 32-33.) Friend one was also wearing a ski mask on top of

his head, and one of the four other individuals stole it before K.S. and his friends could enter the house.

{¶ 5} K.S. remained at friend three's house for approximately three minutes before leaving to walk to his grandparents' house. While he was walking to his grandparents' house, he encountered three of the four individuals who had previously followed K.S. and his friends. This time, however, the ski masks were off their faces, and they pointed to K.S. before running toward him. K.S. ran and slipped through a "cut" in a barbed wire fence. The three individuals following K.S. could not fit through the fence, and one of them told K.S. to "come out of this lot. We just trying to talk." (Tr. 38.) One of the individuals, whom K.S. identified in court as J.G., told K.S. that he wanted his shoes. (Tr. 39 and 42.) K.S. resisted until J.G. "lifted up his hoodie and said, 'I'm about to do it to you if you don't give me your shoes.'" (Tr. 40.) K.S. acquiesced and gave J.G. his shoes. Thereafter, J.G. and the other two individuals fled.

{¶ 6} K.S. told friend two about the robbery because his friend knew one of the individuals who had followed them to friend three's house. K.S. searched for the individual identified by friend two and found him in a post on Instagram wearing K.S.'s shoes. (Tr. 45 and 56-57.) K.S. took a screenshot of the Instagram post, which was introduced at trial as State's exhibit No. 2. While testifying about the screenshot, K.S. noted that the StockX tag could be seen on the side of the shoes. (Tr. 46.) K.S. identified a second Instagram picture, marked as State's exhibit No. 3, that K.S. said also depicted the person who stole his shoes. (Tr. 48.)

{¶ 7} K.S. explained that he sent the screenshots to his cousins, who attended John F. Kennedy High School ("JFK"), to see if they knew the person wearing his shoes in the pictures. (Tr. 49-50 and 63.) According to K.S., his cousins recognized him as a fellow student at their school. (Tr. 49-50.) K.S. took the screenshots to JFK in an attempt to have someone at the school identify the person, but school officials refused to provide information. (Tr. 50.) However, when Cleveland police presented the photos to Officer Deanine Dillard ("Officer Dillard"), a security officer at JFK, she identified him as J.G. (Tr. 65.)

{¶ 8} K.S. spoke with Cleveland police about the robbery on multiple occasions. On one occasion, police detectives presented him with a photo array of potential suspects. K.S. marked one photograph as a potential suspect with 50 percent confidence, noting that he did not "think that's him, but it looked like him." (Tr. 54.) K.S. indicated that the hair on the person he identified in the photo array and J.G.'s hair at the time of the robbery were different. (Tr. 56.) K.S. nevertheless identified J.G. in court as the person who stole his shoes. (Tr. 56.)

{¶ 9} Matthew Scarl ("Scarl"), Deputy Director of Standards and Compliance at the Cuyahoga County Juvenile Court Detention Center ("detention center"), testified that J.G. was detained in House 2 Pod B in the detention center. He further stated that there is a pay phone in House 2 that uses Securus, "a system that monitors phones for correctional agencies" and records phone calls. (Tr. 70-71.) House 2 is also under camera surveillance. After reviewing surveillance footage of House 2, Scarl confirmed that J.G. used the pay phone twice on August 19, 2024.

Scarl identified video footage of House 2, marked as State's exhibit No. 6, showing J.G. using the pay phone in House 2. (Tr. 73-74.)

{¶ 10} Detective Rebecca Werner ("Detective Werner") testified that she investigated the aggravated robbery of K.S. She obtained the demographic profile of J.G. from JFK. The profile established that J.G. was a student enrolled at JFK. She also listened to detention-center phone calls that were recorded on the Securus system, including two calls from someone who identified himself as J.G.

{¶ 11} According to Detective Werner, the first call was placed on August 19, 2024, to an individual whom the caller referred to as "Auntie." Detective Werner investigated the phone number dialed and determined that it belonged to S.C., according to police reports filed in September 2024. Detective Werner testified that, according to another police report, S.C. was J.G.'s aunt. On the recording, which was marked as State's exhibit No. 9, a voice is heard saying, "I gotta pay for the shoes. . . . . They got evidence. They found the picture of me with the shoes on. . . . . They don't got me with no evidence of a weapon." (State's exhibit No. 9.)

{¶ 12} Detective Werner testified that in the second phone call, the caller referred to the recipient of the call as "Ma." During this call, a voice is heard saying:

> They got evidence. . . . . They went to go find my Instagram and everything. . . . . It was stuff that was deleted. . . . . The only reason I don't get charged with no gun is they don't got evidence of me with a gun. They only got evidence of me with the shoes.

(State's exhibit No. 10.) Later in the call, the voice is heard saying, "They got a picture of me. He said it was a fifty percent chance that was me. My hair was shorter than it is now. . . . They got a picture of me off Instagram." (State's exhibit No. 10.)

{¶ 13} Near the end of the second phone call, the voice confirms that he had to return the shoes. K.S. testified earlier that his shoes were returned to him by someone K.S. plays basketball with who also goes to school at JFK. (Tr. 51.) However, when the shoes were returned, they were creased and smelled so bad they had to be thrown away. (Tr. 26-27 and 51-52.)

{¶ 14} At the end of the State's case-in-chief, the State rested subject to the admission of State's exhibits Nos. 1 through 10. Defense counsel objected to several exhibits, including J.G.'s school profile, the Securus call log, and the recorded jail calls, on grounds that the evidence either contained hearsay or was not properly authenticated. The trial court overruled the objections and allowed the exhibits to be entered into evidence. Thereafter, the court found that the State had proven its case beyond a reasonable doubt and adjudicated J.G. delinquent of all counts in the complaint as well as the one- and three-year firearm specifications. The court committed J.G. to a two-year term of detention with the Ohio Department of Youth Services. J.G. now appeals the trial court's judgment.

## II. Law and Analysis

### A. Authentication

{¶ 15} In the first assignment of error, J.G. argues the trial court erred in admitting his school profile and his recorded phone calls into evidence. He contends they were not properly authenticated.

{¶ 16} We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Schleich v. Penn Cent. Corp.*, 2024-Ohio-5005 ¶ 9 (8th Dist.). We, therefore, will not disturb a trial court's evidentiary ruling absent an abuse of discretion.

{¶ 17} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. This court has also held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.).

{¶ 18} Evid.R. 901 governs the authentication of evidence prior to its admissibility and states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Evid.R. 901(B)(1) further provides that evidence may be properly authenticated by the testimony of a witness with knowledge that "a matter is what it is claimed to be."

{¶ 19} "The authentication requirement of Evid.R. 901(A) is a low threshold that does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Toudle*, 2013-Ohio-1548, ¶ 21 (8th Dist.), citing *Yasinow v. Yasinow*, 2006-Ohio-1355, ¶ 81 (8th Dist.), citing *State v. Easter*, 75 Ohio App.3d 22 (4th Dist. 1991); Evid.R. 901(B)(1).

{¶ 20} Testimony by a witness with knowledge "that a matter is what it is claimed to be," is an acceptable method of authentication. *State v. Woods,* 2024-Ohio-467 ¶ 40 (8th Dist.); Evid.R. 901(B)(1). The evidentiary standard for authentication "is less demanding than the preponderance of the evidence." *Id.*, quoting *State v. White*, 2004-Ohio-6005, ¶ 61 (4th Dist.). Circumstantial evidence can also be used to provide authentication. *State v. Paster*, 2014-Ohio-3231, ¶ 32 (8th Dist.).

### 1. School Profile

{¶ 21} J.G. argues the trial court erred in admitting his school profile into evidence because Detective Werner was not the proper person to authenticate it because she lacked personal knowledge of the document, she lacked personal knowledge as to how the document was kept in the regular course of business, and she did not create the record.

{¶ 22} Detective Werner was not the only witness to provide evidence of authentication. Detective Werner received J.G.'s school profile directly from Officer Dillard, who testified that she works as a security guard at JFK and that she knew

J.G. as a student at JFK. (Tr. 63-65.) Thus, the issue with the school profile involves its chain of custody. In *State v. Taylor*, 2012-Ohio-5421 (8th Dist.), this court explained that "chain of custody is part of the authentication and identification requirement in Evid.R. 901." *Id.* at ¶ 36, citing *State v. Brown*, 107 Ohio App.3d 194, 200 (3d Dist. 1995).

> The prosecution bears the burden of establishing a proper chain of custody. *State v. Moore*, 47 Ohio App.2d 181, 183 (9th Dist. 1973). Chain of custody can be established by direct testimony or by inference. *State v. Conley*, 32 Ohio App.2d 54, 60 (3d Dist. 1971). The state, however, has no duty to eliminate every possibility that tampering or substitution occurred. *Id.* The state must only show that it is reasonably certain that a substitution, tampering, or alteration did not occur. *Id.*

{¶ 23} Officer Dillard testified that she worked at J.G.'s school and that she knew J.G., and she identified him in court. (Tr. 64-67.) Her testimony established that she had personal knowledge of J.G. and that she had personal knowledge of J.G.'s attendance at JFK. However, as J.G. argues, neither Detective Werner nor Officer Dillard offered any testimony as to how the school profile was created or as to how it was kept in the regular course of business. Since neither of these witnesses created the school profile, it constituted hearsay, which is generally inadmissible unless subject to one of the hearsay exceptions provided in Evid.R. 803. *See* Evid.R. 802 and 803.

{¶ 24} The State argues the school profile record is admissible under Evid.R. 803(6), which sets forth the "business records exception" to the hearsay rule. However, "[t]o lay a proper foundation for business records under

Evid.R. 803(6), 'the testifying witness must possess a working knowledge of the specific record-keeping system that produced the document.'" *Herrera v. Phil Wha Chung*, 2021-Ohio-1728, ¶ 24 (8th Dist.), quoting *State v. Davis*, 62 Ohio St.3d 326, 342 (1991).

{¶ 25} Neither Detective Werner nor Officer Dillard provided any testimony regarding the record-keeping system that produced J.G.'s profile. The State, therefore, failed to lay a proper foundation for the admission of J.G.'s school profile, and the trial court erred in admitting it without the required foundation. We, nevertheless, find the error harmless.

{¶ 26} Crim.R. 52(A) defines "harmless error" as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry*, 2004-Ohio-297, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741 (1993).

{¶ 27} To be viewed as "affecting substantial rights," the error must have been prejudicial, meaning "'[i]t must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 2003-Ohio-2761, ¶ 7, quoting *Olano*. Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris*, 2014-Ohio-5052, ¶ 24-25.

{¶ 28} The school profile identified J.G. as a student enrolled at JFK. It also provided his date of birth. Dillard testified that, as a result of working as a security

guard at JFK, she knew J.G. because he was a student at JFK. J.G. had previously informed the court that he was 15 years old and in the tenth grade. (Tr. 7.) Therefore, the evidence in the school profile was cumulative to other evidence, and the outcome of the trial would not have been different if it had been excluded. Therefore, the admission of J.G.'s school profile into evidence constitutes a harmless error.

## 2. Detention-Center Phone Calls

{¶ 29} J.G. argues the trial court erred in admitting into evidence the phone recordings from the detention center because Detective Werner lacked sufficient knowledge to identify and authenticate J.G.'s voice on the recordings.

{¶ 30} To be admissible, a recorded telephone call must be "'authentic, accurate, and trustworthy.'" *State v. Thompson*, 2012-Ohio-921, ¶ 28 (8th Dist.), quoting *State v. Tyler*, 2011-Ohio-3937, ¶ 26 (4th Dist.), citing *State v. Were*, 2008-Ohio-2762. However, "'conclusive evidence as to authenticity and identification need not be presented to justify allowing evidence to reach the jury[.]'" *Id.*, quoting *State v. Bell*, 2009-Ohio-2335, ¶ 17 and 30 (12th Dist.). To the contrary, "the evidence required to establish authenticity need only be sufficient to afford a rational basis for a jury to decide that the evidence is what its proponent claims it to be." *Id.*, citing *Bell* at ¶ 17 and 30. The State is not required to "'prove beyond a reasonable doubt that the evidence is what it purports to be.'" *Id.* at ¶ 29, quoting *State v. Moshos*, 2010-Ohio-735, ¶ 12 (12th Dist.). Rather, the State need only establish a "reasonable likelihood" that the recording is authentic. *Id.*

{¶ 31} In *State v. Pruitt*, 2012-Ohio-5418 (8th Dist.), this court held that the content of the recording itself can be sufficient to confirm the identity of the caller. In that case, a witness with knowledge of the phone system inside the jail testified that jail inmates are assigned PIN numbers that are used to place outgoing calls and the calls are recorded on a log. However, because inmates frequently share PIN numbers, the PIN could not be used to identify the caller. However, the content of the recording was sufficient to identify the caller in that case because the statements made during the call "mirrored" the facts of the case. *Id.* at ¶ 13.

{¶ 32} As in *Pruitt*, the content of the two recorded detention-center calls, when considered in conjunction with other testimony, established a rational basis for concluding that J.G. initiated the recorded phone calls because he discusses specific facts of this case with the two recipients of the calls. In State's exhibit No. 9, the caller states, "I gotta pay for the shoes. . . . They got the evidence. They found a picture of me with the shoes on. . . . They don't got me with no evidence of a weapon." These statements mirror K.S.'s testimony wherein he describes finding Instagram photos of J.G. wearing his stolen shoes. The lack of a recovered firearm is also consistent with the evidence.

{¶ 33} Similarly, in State's exhibit No. 10, the caller states, "They got evidence. . . . They went to go find my Instagram and everything. . . . It was stuff that was deleted. . . . The only reason I don't get charged with no gun is they don't got evidence of me with a gun. They only got evidence of me with the shoes." He also states, "They got a picture of me. He said it was a 50 percent chance that was

me.  My hair was just shorter then than it is now.  . . . They got a picture of me off Instagram."  When asked whether he returned the shoes, the caller replies in the affirmative, stating, "They wasn't that messed up.  There was just a little creasing." As with the statements in State's exhibit No. 9, the statements contained in State's exhibit No. 10 relate to specific details in the case and are consistent with the evidence presented by other witnesses.  Therefore, the statements in State's exhibit Nos. 9 and 10 afford a rational basis for the court, as the trier-of-fact, to identify J.G. as the caller in those recordings, and they were properly admitted into evidence.

{¶ 34} Therefore, the first assignment of error is overruled.

## B.  Securus Call Logs

{¶ 35} In the second assignment of error, J.G. argues the trial court erred in admitting the Securus call logs into evidence.  He contends they constitute inadmissible hearsay.

{¶ 36} As previously stated, we review a trial court's decision to admit or exclude evidence for abuse of discretion.  *Schleich*, 2024-Ohio-5005, at ¶ 9.  We, therefore, will not disturb a trial court's evidentiary ruling absent an abuse of discretion.  *Id.*

{¶ 37} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within one of the exceptions listed in Evid.R. 803.  The State contends the Securus logs are admissible pursuant to the "business records exception" set forth

in Evid.R. 803(6) that applies to "records of regularly conducted activity" and includes

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

{¶ 38} To qualify for the business-records exception, (1) the record must be made in the course of a regularly conducted activity; (2) a person with knowledge of the act, event, or condition recorded must have made the record; (3) it must have been recorded at or near the time of the act, event, or condition; and (4) the party who seeks to introduce the record must lay a foundation through testimony of the record custodian or some other qualified witness. *State v. Powell*, 2019-Ohio-4345, ¶ 55 (8th Dist.), citing *State v. Boiani*, 2013-Ohio-1342, ¶ 29 (8th Dist.), citing *State v. Davis*, 2008-Ohio-2, ¶ 171.

{¶ 39} The phrase "other qualified witness" does not necessarily mean that the witness must have firsthand knowledge of the transaction giving rise to the record. *State v. Sherrills*, 2008-Ohio-1950, ¶ 31 (8th Dist.); citing *State v. Vrona*, 47 Ohio App.3d 145 (9th Dist. 1988).

> Rather, it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval, that he [or she] can reasonably testify on the basis of this knowledge that the record is what

> it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).

*Id.*, citing *State v. Shaheen*, 1997 Ohio App. LEXIS 3487 (3d Dist. July 29, 1997); *State v. Patton*, 1992 Ohio App. LEXIS 997 (3d Dist. Mar. 5, 1992).

{¶ 40} Detective Werner testified that she is familiar with the Securus system and that she uses it for investigative purposes. She confirmed that the Securus log presented at trial was "a fair and accurate representation of the Securus logs [she] viewed." (Tr. 82.) She also described how she was able to retrieve J.G.'s phone recordings. However, she provided no testimony regarding how the Securus phone log is prepared or maintained. Although she uses the Securus records, there was no testimony that she is a custodian of the Securus records. Therefore, the State failed to establish that she is a qualified witness who could provide the necessary foundation for the business-records exception, and the trial court erred in admitting the phone log into evidence. We nevertheless find the trial court's error harmless.

{¶ 41} As previously stated, any error in the admission of evidence is harmless if there is no reasonable possibility that the evidence contributed to the accused's conviction. *State v. Szafranski*, 2019-Ohio-4349, ¶ 51 (8th Dist.), citing *State v. Weakley*, 2017-Ohio-8404, ¶ 58 (8th Dist.). In other words, an error is harmless if the outcome would not have been any different even if the erroneously admitted evidence had been excluded. *Fisher*, 2003-Ohio-2761, at ¶ 7, quoting *Olano*, 507 U.S. at 734 ("the error . . . 'must have affected the outcome of the [trial] court proceedings'").

{¶ 42} Detective Werner's testimony regarding the Securus call records was limited to telephone numbers dialed and the dates and times that the calls were made. (Tr. 82-83.) As previously stated, the content of the calls themselves was sufficient to identify J.G. as the caller because the statements made during the calls "mirrored" the facts of the case. *Pruitt*, 2012-Ohio-5418, at ¶ 13. The date and times the calls were made were unnecessary to establish J.G.'s guilt nor were the phone numbers he dialed. Therefore, the outcome of the trial would not have been any different had the Securus call records been excluded and the admission of the call logs into evidence was harmless error.

{¶ 43} The second assignment of error is overruled.

## C. Prosecutorial Misconduct

{¶ 44} In the third assignment of error, J.G. argues the State committed prosecutorial misconduct when it vouched for the credibility of State witnesses. He contends the prosecutorial misconduct deprived him of a fair trial.

{¶ 45} In reviewing a claim of prosecutorial misconduct, the relevant question is whether the prosecutor's "'remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Prejudice is shown when there is a reasonable probability that but for the improper remarks by the prosecutor, the result of the trial would have been different. *State v. Hunt*, 2023-Ohio-1977, ¶ 46 (8th Dist.), citing *State v. Stevens*, 2016-Ohio-446, ¶ 53 (3d Dist.); *State v. Obermiller*, 2016-Ohio-1594, ¶ 105, quoting *State v. Collier*, 2001

Ohio App. LEXIS 4663 (8th Dist. Oct. 18, 2001). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 2004-Ohio-6548, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 46} J.G. objects to the following closing remarks by the prosecutor:

> Unfortunately for [J.G.], the State did have a very reliable witness in [K.S.], a very trustworthy witness. You heard that he was an A and B student, he played basketball. . . . . The Court is not privy to this, but this has been a consistent story that [K.S.] has told me on many, many occasions, and ultimately the Court knows exactly what happened because of the testimony of [K.S.].

{¶ 47} J.G. further asserts that the prosecutor inappropriately vouched for the credibility of Detective Werner when defense counsel objected to the admission of J.G.'s school profile on grounds that it was not properly authenticated. Defense counsel argued that in order to admit the school record, the State should have called the school's records custodian but it failed to do so. (Tr. 91). In response, the State argued that Detective Werner "is of a high degree of trustworthiness. She's a member of the Cleveland Police Force, a longstanding member of the Cleveland Police Force and a longstanding detective." (Tr. 93.) J.G. argues that although the prosecutor was arguing for the admissibility of the exhibit, his statements nevertheless had the effect of inappropriately bolstering the detective's credibility.

{¶ 48} J.G. did not object to the prosecutor's remarks concerning Detective Werner's credibility. He, therefore, forfeited all but plain error as to that issue. Crim.R. 52(B) authorizes appellate courts to correct "'[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his

obligation to bring those errors to the attention of the trial court." *State v. Mosby,* 2024-Ohio-5210*,* ¶ 24 (8th Dist.), quoting Crim.R. 52(B). To prevail under a plain-error analysis, the appellant bears the burden of demonstrating that, but for the error, the outcome of the trial would clearly have been different. *State v. Payne*, 2007-Ohio-4642, ¶ 17. Thus, the test for plain error and prosecutorial misconduct are essentially the same.

{¶ 49} It is inappropriate for a prosecutor to vouch for the credibility of a witness at trial. *State v. Myers*, 2018-Ohio-1903*,* ¶ 145. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *Id.*, citing *State v. Jackson*, 2005-Ohio-5981, ¶ 117; *State v. Davis*, 2008-Ohio-2, ¶ 232. "An attorney may not express a personal belief or opinion as to the credibility of a witness." *Id.*, citing *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).

{¶ 50} The prosecutor clearly vouched for the credibility of both K.S. and Detective Werner. Therefore, because the prosecutor's remarks were improper, we must now determine whether the prosecutor's inappropriate remarks prejudiced J.G.'s right to a fair trial.

{¶ 51} "[I]n reviewing a bench trial, an appellate court presumes that a trial court considered nothing but relevant and competent evidence in reaching its verdict. The presumption may be overcome only by an affirmative showing to the contrary by the appellant." *State v. Wiles*, 59 Ohio St.3d 71, 86 (1991), citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987); *see also State v. Watson*, 2020-Ohio-3462,

¶ 38 (8th Dist.), quoting *State v. Willis*, 2008-Ohio-6156, ¶ 15 (8th Dist.) ("[I]n a bench trial, the court is presumed to have considered only the relevant, material, and competent evidence.").

{¶ 52} Defense counsel objected to the prosecutor's statements regarding K.S.'s credibility, and the court sustained the objection. (Tr. 104.) The court apparently recognized the inappropriate nature of the prosecutor's comments and disregarded them. Moreover, there is nothing in the record to suggest that the court considered the prosecutor's comments when it evaluated K.S.'s credibility.

{¶ 53} Although defense counsel did not object to the prosecutor's statements about Detective's Werner's "high degree of trustworthiness," the presumption that the court relied only on relevant and competent evidence still applies. And J.G. has not made any argument or pointed to any evidence in the record to rebut that presumption. Moreover, K.S.'s testimony, the Instagram screenshots of J.G. wearing K.S.'s shoes, and the detention-center phone recordings overwhelming support the trial court's delinquency determination such that even if the prosecutor had not made the improper comments, the outcome of the trial would not have been different.

{¶ 54} The third assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 55} In the fourth assignment of error, J.G. argues his delinquency adjudications are unsupported by the manifest weight of the evidence.

{¶ 56} In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 1997-Ohio-52. We will reverse a conviction as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387.

{¶ 57} J.G. argues his delinquency adjudications are unsupported by the manifest weight of the evidence because J.G. was only 50 percent confident when he identified J.G. in the photo array and because his in-court identification of J.G. as the person who stole his shoes was inherently prejudicial. He further asserts that the State's case "was strung together with multiple instances of impermissible witness vouching by the prosecutor, improper foundation testimony for proper admission of evidence, and improper hearsay admitted under the guise of business record testimony." (Appellant's brief p. 13.)

{¶ 58} We agree the prosecutor improperly vouched for the credibility of two witnesses and some evidence was erroneously admitted without proper authentication. However, the overwhelming weight of the evidence still weighs heavily in favor of the trial court's judgment.

{¶ 59} K.S. admitted that he was only 50 percent sure that he correctly identified the suspect who stole his shoes from the photo array. However, K.S. also explained how he was able to find Instagram posts of the suspect, later identified as J.G., wearing his stolen shoes. There could be no doubt that J.G. was wearing K.S.'s shoes in the Instagram posts because the StockX tag thereon was visible in the photographs. K.S.'s mother testified that she purchased the shoes from StockX for K.S.'s birthday.

{¶ 60} In addition, the detention-center phone calls contained J.G.'s admissions of guilt. In the first call, marked as State's exhibit No. 9, J.G. admits, "They got the evidence. They found a picture of me with the shoes on. . . . . They don't got me with no evidence of a weapon." In the second call, marked as State's exhibit No. 10, J.G. admits, "They got evidence. . . . . They went to go find my Instagram and everything. . . . It was stuff that was deleted. . . . The only reason I don't get charged with no gun is they don't got evidence of me with a gun. They only got evidence of me with the shoes." He also states, "They got a picture of me. He said it was a 50 percent chance that was me. My hair was just shorter then than it is now. . . . They got a picture of me off Instagram." As previously stated, J.G.'s confessions in State's exhibit Nos. 9 and 10 provide specific, incriminating details about the case and are consistent with the evidence presented by other witnesses.

{¶ 61} Indeed, J.G.'s admission that his hair was shorter when the picture in the photo array was taken than it was at the time of the robbery bolstered K.S.'s identification of J.G. in the photo array. K.S. testified that he was only 50 percent

certain of the photo identification because the hair on the suspect in the photo was "a little different." (Tr. 56.) Moreover, K.S. still identified the correct suspect notwithstanding the differences in appearance. In reviewing the photo array, the court observed:

> I will say that in my viewing of the photo array, obviously he did identify [J.G.] and [J.G.] in that picture looks very different than he looks today and looks very different than he looked in all the time that he's come through here, but also different than he looked in his Instagram pictures.

> So actually I was impressed that he was able to identify him through that picture, but I think it is very clear circumstantial evidence as it relates to this matter and I find that the State of Ohio has absolutely proven their case beyond a reasonable doubt.

(Tr. 109.) Therefore, despite J.G.'s argument to the contrary, this is not an exceptional case in which the trier of fact clearly lost its way and created such a miscarriage of justice that the adjudication of delinquency must be reversed and a new trial ordered. The trial court's judgment is overwhelmingly supported by the manifest weight of the evidence.

**{¶ 62}** The fourth assignment of error is overruled.

**{¶ 63}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The

finding of delinquency having been affirmed, any bail or stay of execution pending appeal is terminated. Case remanded to the trial court for execution of commitment.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MICHAEL JOHN RYAN, J., CONCUR